```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3     UNITED STATES OF AMERICA,          )  Docket No. 19 CR 00226, 1-10
                                          )
 4                       Plaintiff,       )  Chicago, Illinois
                                          )  March 4, 2021
 5                  v.                     )  9:58 a.m.
                                          )
 6     ROBERT M. KOWALSKI, JAN R.         )
       KOWALSKI, ROSALLIE C. CORVITE,     )
 7     JANE V. IRIONDO, ALICIA            )
       MANDUJANO, CATHY M. TORRES,        )
 8     JAMES R. CROTTY, BOGUSLAW          )
       KASPROWICZ, MIROSLAW KREJZA AND    )
 9     MAREK MATCZUK,                     )
                                          )
10                       Defendants.      )

11
                          TRANSCRIPT OF PROCEEDINGS
12                 BEFORE THE HONORABLE VIRGINIA M. KENDALL

13     APPEARANCES:

14     For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                                MR. BRIAN PATRICK NETOLS
15                              MS. MICHELLE PETERSEN
                                Assistant United States Attorneys
16                              219 South Dearborn Street
                                Chicago, Illinois  60604
17
       For Defendant           MR. ROBERT KOWALSKI, Pro Se
18     Robert Kowalski:

19     For Defendant           FEDERAL DEFENDER PROGRAM by
       Robert Kowalski         MR. IMANI CHIPHE
20     as standby counsel:     55 East Monroe Street, Suite 2800
                               Chicago, Illinois  60603
21

22

23     Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Official Court Reporter
24                             219 S. Dearborn Street, Room 2504
                               Chicago, IL 60604
25                             312.435.6047
                               gayle_mcguigan@ilnd.uscourts.gov
```

```
 1    APPEARANCES:  (Continued)

 2

 3    For Defendant          MR. WILLIAM SEAN STANTON
      Jan R. Kowalski:       53 West Jackson Boulevard, Suite 1062
 4                           Chicago, Illinois  60604

 5    For Defendant          FAEGRE DRINKER BIDDLE & REATH LLP by
      Corvite:               MR. CARRIE ELIZABETH DELANGE
 6                           191 North Wacker Drive, Suite 3700
                             Chicago, Illinois  60606-1698
 7
      For Defendant          EKL WILLIAMS & PROVENZALE LLC
 8    Iriondo:               MR. TERRY A. EKL
                             901 Warrenville Road, Suite 175
 9                           Lisle, Illinois  60532

10    For Defendant          HENDERSON PARKS LLC by
      Mandujano:             MR. COLIN QUINN COMMITO
11                           140 South Dearborn Street, Suite 1020
                             Chicago, Illinois  60603
12
      For Defendant          LAW OFFICES OF MARC M. BARNETT by
13    Torres:                MR. AARON ROSENBLATT
                             53 West Jackson Boulevard, Suite 1442
14                           Chicago, Illinois  60604

15    For Defendant          KOPECKY SCHUMACHER ROSENBURG LLC by
      Crotty:                MR. JAMES L. KOPECKY
16                           120 North LaSalle Street, Suite 2000
                             Chicago, Illinois  60601
17
      For Defendant          SHEPPARD LAW FIRM PC by
18    Kasprowicz:            MR. ADAM JORDAN SHEPPARD
                             180 North LaSalle Street, Suite 2510
19                           Chicago, Illinois  60601

20    For Defendant          SHILLER PREYAR LAW OFFICES by
      Krejza:                MR. WAYNE SLAUGHTER
21                           601 South California Avenue
                             Chicago, Illinois  60612
22

23

24

25
```

```
 1    APPEARANCES:  (Continued)

 2

 3    For Defendant           PISSETZKY LAW by
      Matczuk:                MR. GAL PISSETZKY
 4                            35 East Wacker Drive, Suite 1980
                              Chicago, Illinois  60601
 5
                              MR. LAWRENCE H. HYMAN
 6                            111 West Washington Street, Suite 1025
                              Chicago, Illinois  60602
 7
      Polish Interpreter:     MR. WOJCIECH STREMEL
 8
      Pretrial Services       MS. CHRISTA GREEN (Via Telephone)
 9    Officers:               MS. CARLA TRAMONTE  (Via Telephone)
                              MS. ASHLEY SIMON  (Via Telephone)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (In open court.)

2         THE CLERK:  19 CR 226, Defendants 1 through 10,

3 U.S. versus Robert Kowalski, Jan Kowalski, Rosallie Corvite,

4 Jane Iriondo, Alicia Mandujano, Cathy Torres, James Crotty,

5 Boguslaw Kasprowicz, Miroslaw Krejza, and Marek Matczuk.

6         Please be seated and come to order.

7         THE COURT:  A little backward, but we'll do that

8 again.

9         The case has been called, so the prosecutors and the

10 defense, please approach.

11         MR. NETOLS:  Brian Netols, N-E-T-O-L-S, and Michelle

12 Petersen on behalf of the United States.

13         MS. PETERSEN:  Good morning, your Honor.

14         THE COURT:  Good morning.

15         DEFENDANT ROBERT KOWALSKI:  Good morning, your Honor.

16 Robert Kowalski.

17         THE COURT:  Good morning, Mr. Kowalski.

18         Do I have Mr. Chiphe?  I do.

19         MR. CHIPHE:  Good morning, your Honor.  Imani Chiphe.

20 I'm standby counsel for Mr. Kowalski.

21         THE COURT:  Thank you very much.

22         MS. DELANGE:  Good morning, your Honor.  Carrie

23 Delange on behalf of Ms. Corvite, who is present by phone.

24         THE COURT:  Hold on just a second.  Make sure I get my

25 little scorecard here.

1            Who are you representing?

2            MS. DELANGE:  Ms. Rosallie Corvite, who is present by

3    phone.

4            MR. ROSENBLATT:  Good morning, your Honor --

5            THE COURT:  Hold on just one second.

6            Good morning, Ms. Corvite.

7            DEFENDANT CORVITE:  Good morning, your Honor.

8    Rosallie Corvite on the line.

9            THE COURT:  Thank you.

10           Who was saying next?  Go ahead, sir.

11           MR. ROSENBLATT:  Good morning, your Honor.  Aaron

12   Rosenblatt, stepping in for attorney Marc Barnett, on behalf of

13   Ms. Cathy Torres, present before the Court.

14           THE COURT:  Okay.  Tell me your name again.

15           MR. ROSENBLATT:  Aaron Rosenblatt.

16           THE COURT:  Rosenblatt.  Thank you very much.

17           MR. STANTON:  Good morning, your Honor.  Bill Stanton,

18   S-T-A-N-T-O-N, on behalf of Jan Kowalski, present to my right.

19           THE COURT:  Good morning, Mr. Stanton.

20           And good morning, Mr. -- or Ms. Kowalski.

21           I didn't hear you.

22           MR. STANTON:  She said good morning, your Honor.

23           THE COURT:  She did?  Thank you.

24           Okay.  Next?

25           MR. SHEPPARD:  Good morning, your Honor.  Adam

1    Sheppard of Sheppard Law Firm on behalf of Boguslaw Kasprowicz,

2    who is present before this Honorable Court, next to me.

3         DEFENDANT KASPROWICZ:  Good morning, your Honor.

4         THE COURT:  Good morning.

5         Good morning, Mr. Sheppard.

6         Good morning, Mr. Kasprowicz.  Is that right?

7         DEFENDANT KASPROWICZ:  Correct.

8         THE COURT:  Okay.  Thank you.

9         MR. PISSETZKY:  Good morning, your Honor.  Gal

10   Pissetzky and Lawrence Hyman for Mr. Marek Matczuk, who is here

11   in court right behind Mr. Hyman.

12        THE COURT:  Good morning, Mr. Pissetzky.

13        And good morning, Mr. Matczuk.

14        DEFENDANT MATCZUK:  Good morning.

15        MR. EKL:  Good morning, your Honor.  Terry Ekl, E-K-L,

16   on behalf of Jane Iriondo, who is present to my left.

17        THE COURT:  Okay, hold on.  Mr. Ekl.

18        And where is -- it's Ms. Iriondo?  Oh, there you are.

19   Good morning, Ms. Iriondo.

20        Could you maybe spread out a little bit so we don't

21   have people standing -- yes.  Yes, move everybody over so

22   everybody can see the bench and stand by your clients, which

23   would be the best for me.

24        You can move this way as well.  They're not going to

25   bite.

1              Okay.  Thank you.

2              Who is next?

3              MR. SLAUGHTER:  Good morning, your Honor.  Wayne

4    Slaughter on behalf of Brendan Shiller.  I'm here with my

5    client Miroslaw Krejzlow -- Krejza.

6              COURT REPORTER:  I'm sorry --

7              THE COURT:  I did not get your name.

8              MR. SLAUGHTER:  Wayne Slaughter.

9              THE COURT:  Schneider?

10             MR. SLAUGHTER:  Slaughter.  S-L-A-U-G-H-T-E-R.

11   Slaughter.

12             THE COURT:  Slaughter.  Good morning.

13             And you represent Mr. Krejza?

14             MR. SLAUGHTER:  Krejza.  That's correct, yeah.

15             DEFENDANT KREJZA:  Good morning.

16             THE COURT:  Good morning, sir.

17             MR. COMMITO:  For the record, my name is Colin Quinn

18   Commito.  Last name is C-O-M-M-I-T-O.  I represent

19   Ms. Mandujano.

20             THE COURT:  Good morning.

21             Good morning, Ms. Mandujano.

22             DEFENDANT MANDUJANO:  Good morning.

23             THE COURT:  Okay, Commito.

24             All right.  Who have I not had?  Yes, sir.

25             MR. KOPECKY:  Good morning, your Honor.  Jim Kopecky,

1    K-O-P-E-C-K-Y, on behalf of Mr. James Crotty, who is present

2    with me --

3                    THE COURT:  Okay.  Was it Jopecky did you say?

4                    MR. KOPECKY:  No.  K, Kopecky.

5                    THE COURT:  K, Kopecky.  Okay.  And who are you

6    representing?  Mr. Crotty?

7                    MR. KOPECKY:  Yes.

8                    THE COURT:  Okay.  Thank you.

9                    Good morning, Mr. Crotty.

10                   DEFENDANT CROTTY:  Good morning, your Honor.

11                   THE COURT:  Kopecky.  Okay.

12                   Anyone else?  Yes, sir.

13                   INTERPRETER:  Good morning, your Honor.  Wojciech

14   Stremel, Polish interpreter.  I understand two of the

15   defendants need interpretation into Polish language.

16                   THE COURT:  Thank you.  Can you tell me who they are?

17                   INTERPRETER:  I was told Mr. Matczuk and Mr. Krejza.

18                   THE COURT:  Okay.

19                   INTERPRETER:  Could they identify themselves?

20                   COURT REPORTER:  Judge, can I get the spelling of the

21   interpreter's name?

22                   THE COURT:  Yes, I'll get that in a moment.

23                   I have a court interpreter here for the Polish

24   language.

25                   Is there anyone else that would like to have a headset

1    on to hear the Polish language if it's your first language and

2    you feel more comfortable with it?

3            Please raise your hand, and we'll get you a headset.

4            I need the court interpreter to come up here and spell

5    your name, and I need to swear you in, sir.

6            Spell your name for the court reporter first.

7            INTERPRETER:  The first name is spelled

8    W-O-J-C-I-E-C-H.  Last name, S-T-R-E-M-E-L.

9            THE COURT:  Okay.  Good morning.

10           Please raise your right hand.

11           Do you solemnly swear that you will justly, truly,

12   fairly, and impartially act as an interpreter in the case now

13   before the Court, so help you God?

14           INTERPRETER:  Yes, I do.

15       (Interpreter duly sworn.)

16           THE COURT:  Thank you.

17           Okay.  One last time.  Is there anyone who might need

18   the aid of an interpreter?  If so, raise your hand, and I will

19   get you a headset.

20           Okay.  All right.  Do I have all the defendants now?

21           MR. NETOLS:  I believe we do, your Honor.

22           THE COURT:  Okay.  So let's get started.

23           I have a superseding indictment.  And I want to go

24   through each individual defendant and make sure that you have

25   read it and whether you waive formal reading of it.  And then I

1    need to get your plea.  And I need Mr. Netols or Ms. Petersen

2    to tell each defendant separately what their maximum penalties

3    are.  Okay?

4            So we'll start with you, Mr. Kowalski.

5            Mr. Kowalski, have you received a copy of the

6    superseding indictment, sir?

7            DEFENDANT ROBERT KOWALSKI:  I did this morning, Judge.

8            THE COURT:  Okay.  Do you waive formal reading?

9            DEFENDANT ROBERT KOWALSKI:  No.

10           THE COURT:  Okay.  Do you want me to read it?

11           DEFENDANT ROBERT KOWALSKI:  Please, your Honor.

12           THE COURT:  I'll wait until the end of the case then

13   for you.

14           Okay.  Ms. Kowalski, are you here?

15           There you are.

16           MR. STANTON:  Yes, Judge, on behalf of Ms. Kowalski,

17   I'm Bill Stanton.

18           We have received the third superseding indictment,

19   waive formal reading, enter plea of not guilty to the counts in

20   which Ms. Kowalski is charged.

21           THE COURT:  Okay.  Very well.  I'll enter a plea of

22   not guilty.

23           Please tell her the maximum penalties under the law.

24           MR. NETOLS:  Yes, your Honor.

25           And for the record, with respect to Ms. Kowalski,

1    there are no new charges as to her.

2              And she is still charged with 18 U.S.C -- violations

3    of 18 U.S.C. 157, (1), (2), and (3), and 152.

4              Those all have five-year maximum incarceration times,

5    $250,000 fines, twice the gross gain or loss as applicable, and

6    supervised release of up to three years.

7              THE COURT:  Is she charged in a forfeiture count as

8    well?

9              MR. NETOLS:  She is, yes.

10             THE COURT:  I always like to include that because it

11   is really a penalty that she could be facing.

12             MR. NETOLS:  Yes.  She is in Count -- forfeiture

13   allegation 3, your Honor.

14             THE COURT:  Okay.  Do you understand, Ms. Kowalski,

15   that that is the maximum amount of time and penalty that you

16   can receive if you're convicted of this superseding indictment

17   of all counts?

18             DEFENDANT JAN KOWALSKI:  Yes.

19             THE COURT:  Okay.

20             All right.  Let's turn to Ms. Corvite.  Or Corvite?

21   Is that right?

22             MS. DELANGE:  Yes, your Honor.  I --

23             THE COURT:  Can you tell just tell me, Corvite?

24             MS. DELANGE:  Corvite.

25             THE COURT:  Thank you.  Okay.

1        MS. DELANGE:  Yes, your Honor.  We have received a

2    copy of the superseding indictment.  We would waive formal

3    reading and would enter a plea of not guilty.

4        THE COURT:  Okay.  I'll do that now.

5        And, Mr. Netols, the maximum penalty, please?

6        MR. NETOLS:  Yes, your Honor.

7        Again, for the record, there are no new charges

8    against this defendant.

9        She is charged with one count of 18 U.S.C. 371 and two

10   counts of 18 U.S.C. 1005.

11       The 371 violation, maximum is five years and $250,000.

12       The 1005s are 30 years and $1 million each.

13       THE COURT:  Okay.  Do you under -- where is she?

14       MS. DELANGE:  She's on the phone, your Honor.

15       THE COURT:  Oh, she's on the phone.  Thank you.

16       Ms. Corvite, did you hear that that's the maximum

17   amount of time and penalty that you can receive if you're

18   convicted of all the charges in the indictment?

19       DEFENDANT CORVITE:  Yes, your Honor.

20       THE COURT:  Okay.  Thank you.

21       All right.  Ms. Iriondo.

22       MR. EKL:  Yes, your Honor.  For the record, Terry Ekl

23   on behalf of Ms. Iriondo.

24       She has received the indictment.  We've reviewed it.

25   She enters a plea of not guilty.  And we waive formal reading.

1            THE COURT:  Okay.  I'll do so.

2            And, please, the maximum penalties?

3            MR. NETOLS:  Yes, your Honor.

4            Again, no changes in this one.

5            Same charges as the last defendant.  One count of 18

6    U.S.C. 371.  Maximum penalty of five years and $250,000, twice

7    the gross gain as well.

8            And the 1005s are 30 years and $1 million, twice the

9    gross gain.

10           THE COURT:  Okay.  Do you understand that that is the

11   maximum amount of time and penalty that you could receive if

12   you're convicted of all of the counts of the indictment?

13           DEFENDANT IRIONDO:  Yes, I do, your Honor.

14           THE COURT:  Okay.

15           All right.  Alicia Mandujano?

16           Thank you.

17           MR. COMMITO:  Judge, good morning.  Colin Quinn

18   Commito.

19           We acknowledge receipt of the superseding indictment,

20   waive formal reading, enter plea of not guilty.

21           THE COURT:  Okay, I'll do so.

22           Maximum penalties, please?

23           MR. NETOLS:  Your Honor, same -- no changes in the

24   charges.  Same penalties.  One violation of 18 U.S.C. 371.

25   Five years, $250,000, twice the gross gain.

1          Two violations of 1005, 30 years, $1 million, twice

2     the gross gain.

3          THE COURT:  Ms. Mandujano, do you understand that, if

4     you're convicted of all the counts in the superseding

5     indictment, that that is the maximum amount of time and penalty

6     you can receive?

7          DEFENDANT MANDUJANO:  Yes, your Honor.

8          THE COURT:  Okay.

9          Ms. Torres, please?

10          MR. ROSENBLATT:  Torres.

11          THE COURT:  Thank you.

12          MR. ROSENBLATT:  We have received and reviewed the

13     indictment.  We do waive formal reading and enter a plea of not

14     guilty.

15          THE COURT:  Okay.  Thank you, Ms. Rosenblatt.  Not

16     guilty will be entered.

17          And the maximum penalties, please?

18          MR. NETOLS:  Yes, your Honor.

19          Again with this defendant, no new charges, same

20     penalties.  One violation of 18 U.S.C. 371, five years,

21     $250,000, twice the gross gain.

22          Two violations of 18 U.S.C. 1005, thirty years,

23     $1 million, twice the gross gain.

24          THE COURT:  Okay.  All right, thank you.

25          Do you understand, Ms. Torres, that that's the maximum

1    amount of time and penalty you can receive if you're convicted

2    of all of the counts of this superseding indictment?

3            DEFENDANT TORRES:  Yes, your Honor.

4            THE COURT:  All right.

5            I will move on to Mr. Crotty then.

6            MR. KOPECKY:  Over here, your Honor.

7            THE COURT:  Thank you.

8            MR. KOPECKY:  Good morning.  Jim Kopecky on behalf of

9    Mr. Crotty.

10           Your Honor, we do acknowledge receipt of the

11   indictment, waive a formal reading, and enter a plea of not

12   guilty.

13           THE COURT:  Okay, Mr. Kopecky.  I'll enter a plea of

14   not guilty.

15           And maximum penalties?

16           MR. NETOLS:  Yes, your Honor.

17           This is a new defendant.  He's named in Counts One

18   and -- for violation of 18 U.S.C. 371.  Five years, $250,000,

19   twice the gross gain.

20           And then two counts of 18 U.S.C. 1005, Counts Two and

21   Five.  And they are, again, 30 years, $1 million --

22           THE COURT:  Okay.

23           MR. NETOLS:  -- twice the gross gain or loss.

24           THE COURT:  Mr. Crotty, do you understand that is the

25   maximum amount of time and penalty that you can receive if you

1  are convicted of all the counts of the superseding -- oh, no --

2  yes, superseding indictment?

3         DEFENDANT CROTTY:  Yes, your Honor.

4         THE COURT:  Okay.  Thank you.

5         Mr. Kasprowicz?

6         MR. SHEPPARD:  Yes, your Honor.

7         On behalf of Mr. Kasprowicz, we acknowledge receipt of

8  the superseding indictment, waive formal reading thereof, and

9  enter a plea of not guilty.

10         THE COURT:  Okay.  Mr. Sheppard, I'll enter that plea.

11         And the maximum penalties, please, for Mr. Kasprowicz?

12         MR. NETOLS:  Yes, your Honor.

13         This is a new defendant.  He's charged in Count One

14  with violating 18 U.S.C. 371.  Five years, $250,000, twice the

15  gross gain.

16         He's also charged in Count Seven with violating 18

17  U.S.C. 656, embezzlement of bank money.  And that's a 30-year

18  sentence, $1 million, twice the gross gain/loss.

19         THE COURT:  Okay.

20         MR. NETOLS:  And he's also charged in eight tax counts

21  for violating 18 U.S.C. 7206(1) where we have a maximum penalty

22  of three years, $250,000, plus cost of prosecution, and one

23  year supervised release for each.

24         THE COURT:  Okay.  Mr. Kasprowicz, do you understand

25  that that's the maximum amount of time and penalty you can

1    receive if you are convicted of all counts of this indictment,
2    sir?
3         DEFENDANT KASPROWICZ:  Yes, your Honor, I do.
4         THE COURT:  Okay.
5         Mr. Krejza?
6         MR. SLAUGHTER:  Wayne Slaughter, your Honor, on
7    behalf --
8         THE COURT:  Wait, where is the lawyer?
9         MR. SLAUGHTER:  Who did you call, your Honor?  Krejza?
10        THE COURT:  I have such a hard time hearing you
11   through that kind of mask that you have.  Maybe if you can come
12   up here.  I'm sorry.
13        MR. SLAUGHTER:  That's okay.
14        Good morning, your Honor.  Wayne Slaughter on behalf
15   of Mr. Krejza.
16        We're pleading not guilty and waive formal reading of
17   the indictment.
18        THE COURT:  Okay.  Thank you, Mr. Slaughter.  I will
19   enter a plea of not guilty.
20        And please tell Mr. Krejza what his maximum penalties
21   are.
22        MR. NETOLS:  Yes, your Honor.
23        This is a new defendant.  He's charged in Count One
24   with violating 18 U.S.C. 371.  Maximum penalty of five years'
25   imprisonment, $250,000 fine, twice the gross gain.

1           And he's named in Count Eight with violation of 18

2    U.S.C. 656, embezzlement of bank money, which is 30 years,

3    $1 million, twice the gross gain/loss.

4           THE COURT:  Okay.  Mr. Krejza, do you understand, sir,

5    that, if you are convicted of all of the counts in the

6    superseding indictment, that that is the maximum amount of time

7    and penalty that you can receive?

8           DEFENDANT KREJZA:  Yes.

9           THE COURT:  Okay.  And, Mr. Krejza, are you having any

10   difficulty with the interpretation today?

11          DEFENDANT KREJZA:  No.

12          THE COURT:  Excellent.

13          Okay, Mr. Matczuk?

14          MR. PISSETZKY:  Good after -- good morning, your

15   Honor.

16          We're going to enter a plea of not guilty on all

17   counts for Mr. Matczuk and waive formal reading of the

18   indictment.

19          THE COURT:  Okay.  All right.  Thank you,

20   Mr. Pissetzky.  I'll enter that plea of not guilty.

21          And, please, for the maximum penalties?

22          MR. NETOLS:  Yes, your Honor.

23          This is a new defendant.  He's charged in Count One

24   with violating 18 U.S.C. 371.  Five years, $250,000, twice the

25   gross gain.

1          And in Count Nine with violating 18 U.S.C. 656,

2     embezzlement of bank money, 30 years, $1 million, twice the

3     gross gain/loss.

4          THE COURT:  Okay.  All right.  Mr. Matczuk, do you

5     understand, sir, that that is the maximum amount of time and

6     penalty that you can receive if you are convicted of all of the

7     counts of the superseding indictment?

8          DEFENDANT MATCZUK:  Yes.

9          THE COURT:  Okay.  Thank you.

10         Now, all defense -- gentlemen, and one lady, is anyone

11    in need of consulate notification for your client, or do we

12    have all U.S. citizens?

13         If anyone is in need, let me know.

14       (No showing of hands.)

15         THE COURT:  All right then.  Have you had a Rule 16

16    conference with any of these new defendants?

17         MS. PETERSEN:  Your Honor, we have not -- some

18    informal discovery has gone to some of these defendants, but we

19    have not had a formal Rule 16 conference.

20         I do anticipate the initial discovery production will

21    happen in the next few weeks.

22         THE COURT:  Okay.  I'm going to require that you have

23    a Rule 16 discussion on or before March 25th so that you can

24    give the defense counsel notice of how you will be turning over

25    the materials and in what format.  All right?

1          And then as far as pretrial motions, I know from the

2     first case that we have a significant amount of material, so

3     I'm going to, instead of giving a pretrial motion deadline for

4     this new material, I'm going to have a status in 60 days where

5     you gentlemen and one lady can tell me what needs to be done as

6     we move forward with your review of the evidence.  Okay?

7          In a case like this with multiple defendants, I want

8     defense counsel to notify me ASAP if you have any issues

9     reading the material that you're receiving, if it is not being

10    turned over in a proper fashion so you can't access it, so that

11    I can address those issues on a regular basis so that you can

12    get what you need so we don't delay getting you to a trial

13    date.  Okay?  So I am not bothered by those motions.  Feel free

14    to motion them up.

15         Okay.  Now, let's turn to the issue of release or

16    detention.

17         And do you have bond -- well, those who -- let's start

18    with those who have already been indicted and are on supervised

19    release -- I mean, pretrial release.

20         Any changes to any of them?

21         MR. NETOLS:  No, your Honor.

22         Our view is that the same bond should stand for the

23    first six defendants:  Robert Kowalski, Jan Kowalski, Rosallie

24    Corvite, Jane Iriondo, Alicia Mandujano, and Cathy Torres.

25         THE COURT:  Okay.  So for all of you, it's the same

1    conditions of release that you are currently on.  Those are

2    court orders.  I have a standing order with the Pretrial

3    Services Department that they notify me of any even minor

4    violation so that we can address them immediately to make sure

5    that you stay on track.

6            And so for those six defendants -- Jan Kowalski,

7    Corvite, Iriondo, Mandujano, Torres, you all can be done today

8    if you want to move on.

9            Right?  You have nothing else to add?

10           MS. PETERSEN:  I would just ask that time be excluded

11   until the next status to give them more time to review

12   discovery and prepare any pretrial motions.

13           THE COURT:  Yes, of course.  I'm sorry.  I didn't want

14   to jump the gun on that.

15           Can you give me a date?

16           THE CLERK:  Yes.  April 30th at 10:00 a.m.

17           THE COURT:  Okay, April 30th.

18           Do you agree, Mr. Stanton, to the exclusion of time?

19           MR. STANTON:  No objection, Judge.  Thank you.

20           THE COURT:  Mr. Delange, do you agree?

21           MS. DELANGE:  Ms. Delange.

22           THE COURT:  Ms. Delange.

23           MS. DELANGE:  No objection.

24           THE COURT:  Thank you very much.

25           Mr. Commito?

1           MR. COMMITO:  No objection, Judge.

2           THE COURT:  Mr. Rosenblatt?

3           MR. ROSENBLATT:  No objection, your Honor.

4           THE COURT:  Okay.  One, two, three -- oh, Mr. Ekl?

5           MR. EKL:  No objection, Judge.

6           THE COURT:  Okay.  Did I get all six in the front

7    there?

8           MR. NETOLS:  I believe you did.  Obviously,

9    Mr. Kowalski is --

10          THE COURT:  Yes, I'm waiting on him.  Thank you.

11          Okay.  So now anything to address with those who have

12   just been arraigned?

13          MR. NETOLS:  I don't believe so.  I believe some of

14   them are making arrangements to kind of finalize their

15   processing, so if they can leave now, they might be able to do

16   that.

17          THE COURT:  Oh, okay.  So if you haven't been

18   processed -- are they to report to the 24th floor?

19          MS. PETERSEN:  Every -- all of these defendants need

20   to have their DNA swab.  And there's case agents outside the

21   courtroom that can meet and do that for them.

22          Only Ms. Iriondo needs to go to the marshals, and she

23   knows that and I think has made arrangements to do that.

24          THE COURT:  Okay.  Very well.

25          All right.  So those of you who I just talked to, time

1    is excluded until the end of April, and you may be excused.

2            Thank you very much.

3            MR. STANTON:  Thank you, Judge.  Have a nice day.

4            THE COURT:  You, too.

5            Okay.  Now I'd like to turn to -- oh, is Ms. --

6    Ms. Kowalski, I'd like you to stay.

7            Mr. Stanton, can you stay?  Because I got a pretrial

8    violation report last night, so I need to address that.  Okay?

9            MR. STANTON:  Certainly.

10           THE COURT:  Do I have Ms. Green on the telephone, by

11   the way?

12           THE CLERK:  You do, your Honor.

13           PRETRIAL SERVICES OFFICER:  Christa Green from

14   Pretrial is on the line.

15           THE COURT:  Thank you very much.

16           Let's turn then to Mr. Kopecky's client, Mr. Crotty.

17           MR. NETOLS:  Yes, your Honor.

18           THE COURT:  Do you have anything worked out with him?

19           MR. NETOLS:  We do, your Honor.

20           We're going to recommend an OR bond and -- with

21   certain conditions that were recommended by Pretrial Services.

22           Mr. Crotty is a resident of the Northern District.  He

23   doesn't have extensive travel.  So our view is that as long as

24   he's just restricted to the United States -- I understand he

25   has some domestic travel plans.  We're not going to object to

1    that.

2            We've had discussions with Mr. Crotty and his attorney

3    for some period of time.  He's been cooperating, and he's known

4    this day is coming.  And he's not -- unlike some of the other

5    defendants, he did not -- he's not charged with actually

6    receiving millions of dollars, so there's no issue of --

7            THE COURT:  Okay, can I --

8            MR. NETOLS:  -- concern about that there's money to be

9    used to flee or anything, so we're going to ask for an OR bond.

10           I believe that's been tendered --

11           MR. KOPECKY:  Yes.

12           MS. PETERSEN:  I believe there might be one quick

13   addition because I think that that version restricts his travel

14   to the Northern District, if you want to scratch it out and

15   write the United States -- oh, it does.  I'm sorry --

16           MR. NETOLS:  It says Continental United States.

17           MS. PETERSEN:  Yes.

18           THE COURT:  Okay.  Can I see it, please?

19           MS. PETERSEN:  Do you want to -- did he sign or do you

20   want to see?

21           MR. KOPECKY:  I'll have him sign.

22           THE COURT:  He hasn't signed yet?

23           MR. KOPECKY:  He has not signed yet.

24           You're signing your bond right here.

25           MR. NETOLS:  Would you like a separate set or wait --

1          THE CLERK:  I can only make copies of the originals --

2      (Counsel conferring.)

3          MR. NETOLS:  We're good.  That's an extra copy for the

4      judge to look at it.

5          THE CLERK:  Here you go, Judge.

6      (Document tendered to the Court.)

7          THE COURT:  Okay.  I have a copy, but I -- if you'd

8      give the --

9          MR. KOPECKY:  The signed one?

10         THE COURT:  -- signed one to Lynn, please, I would

11     appreciate it.

12     (Document tendered to the clerk.)

13         THE COURT:  All right.  Mr. Crotty, this is what you

14     need to know about being released on this OR bond, sir.

15         While you are on this bond, you shall not violate any

16     federal, state, or local law.

17         You must cooperate in the collection of a DNA sample.

18         Ms. Petersen, he, I assume, has not done that yet?

19         MS. PETERSEN:  That's correct, your Honor.  I believe

20     he's going to do it after court today.

21         THE COURT:  Okay.  So after court today, you'll do

22     that.

23         You must advise Pretrial Services or the supervising

24     officer in writing before making any change of your residence

25     or your telephone number.

1              And you must appear in court when you are required to

2      do so.

3              And if you're convicted, you must surrender as

4      directed.

5              You must appear on April 30 at 10:00 o'clock unless

6      your attorney asks for your presence to be waived.  Okay?

7      Otherwise, you need to appear at all court appearances.

8              And these are the conditions, sir, of your release.

9              You shall surrender any passport to Pretrial Services.

10     Not obtain any passport or other international document, travel

11     document, and remain within the Continental United States.

12             You shall not possess a firearm or a destructive

13     device or any other weapon.

14             And you shall report as soon as possible to the

15     Pretrial Services Officer every contact with law enforcement,

16     and that includes even being questioned or a traffic stop, and

17     especially an arrest.

18             You shall surrender your Firearm Owners ID card and

19     your CCL cards to U.S. Pretrial Services.  And you shall

20     transfer possession of firearms to a holder of a FOID card.

21             I think we need to put a date on that, folks.

22             So how long will it take you to get those firearms to

23     someone?

24             MR. KOPECKY:  Well, given that it's coming up on the

25     weekend, if we could have seven days.

1          THE COURT:  Sure.  Thank you very much.  We'll go

2     seven days out.  So I'm going to add that to your bond.  That

3     will be the 11th, March 11th.  Okay?

4          Now, if you violate any of those conditions, it can

5     result in you being revoked and sent to jail before the

6     resolution of the case.

7          It also could result in you having -- facing new

8     charges, either criminal charges or obstruction of justice.

9          Do you understand that?

10         DEFENDANT CROTTY:  Yes, I do, your Honor.

11         THE COURT:  Okay.  All right.  Then I'm going to order

12    your release.

13         And, Ms. Petersen, does he need to be processed with

14    the marshals as well?

15         MS. PETERSEN:  He does, your Honor.

16         THE COURT:  Okay.  And you know that, sir?

17         MR. KOPECKY:  Yes.  We're trying to work out the

18    scheduling of that.  They're only taking two a day, so if you

19    could give us --

20         COURT REPORTER:  I'm sorry, I can't --

21         MR. KOPECKY:  They're only accepting two people a day

22    right now, so if you could give us seven days to do that, too,

23    I'd appreciate it.

24         THE COURT:  I will.  I'll do that.  So by March 11.

25    Okay?

1          And then I need the defendant's signature on --

2          THE CLERK:  They gave me two copies.

3          THE COURT:  Oh, you're doing it.

4          And are you adding the date he needs to appear and the

5     modification I just made --

6          THE CLERK:  Yes, I am.

7          THE COURT:  Okay.  Very well.  All right then.  You

8     can be free to leave.

9          And I'll go on to the next defendant.

10          MR. KOPECKY:  Thank you.

11          THE DEFENDANT:  Thank you, your Honor.

12          THE COURT:  All right.  So Mr. Kasprowicz -- or

13    Kasprowicz?

14          MR. NETOLS:  Your Honor, it might be easier to --

15    if -- and more efficient for the Court if we were to do

16    Mr. Krejza next.  I think we have an agreement.

17          We have some serious concerns about both

18    Mr. Kasprowicz and Mr. Matczuk --

19          THE COURT:  Okay.  So let's do the ones that you don't

20    have any difficulties with right now.

21          MR. NETOLS:  I'm going to tender some unsigned copies,

22    and it can explain the content.

23       (Document tendered to the Court.)

24          THE COURT:  So this is Mr. Krejza?

25          MR. SLAUGHTER:  Yes, ma'am.

1          THE COURT:  And Mr. Stanton -- oh, no, it's

2    Mr. Slaughter.

3          MR. SLAUGHTER:  Mr. Krejza is coming in, Judge.  He

4    was outside reading the bond.

5          THE COURT:  Okay.

6       (Pause in proceedings.)

7          MR. NETOLS:  Your Honor, while he's doing that, should

8    I address the conditions for your benefit or wait?

9          THE COURT:  No --

10          MR. SLAUGHTER:  Here he is.

11          THE COURT:  I'd like him here.

12       (Defendant Krejza enters courtroom.)

13          THE COURT:  And he needs the interpreter as well.

14          Okay.  Go ahead, Mr. Netols.

15          MR. NETOLS:  Yes, your Honor.

16          We do have recommended conditions of release.  It

17    differs slightly from Pretrial Services' recommendation.

18          We're agreeing to the conditions, but our concern was

19    for an unsecured, an OR bond.

20          Mr. Krejza is charged with embezzling $2.8 million.

21    In our view, the nature of the offense and the fact that he is

22    looking at a significant amount of time under the guidelines --

23    and I can go into detail -- but the guidelines will easily

24    cover the statutory maximums, that we were concerned to have --

25    that the Court should have a little bit more assurance that he

1    would be here.  We've had discussions.  There's an agreement to

2    post a piece of property to secure a $50,000 bond.  And that

3    property is at 3934 West Argyle Street, Unit Two, in Chicago.

4           And so the proposed order and appearance bond will

5    contain those conditions.

6           And there is also a -- here you go -- is this signed,

7    too?

8        (Document tendered to the Court.)

9           MS. PETERSEN:  We're passing up the signed copies,

10   your Honor.

11          THE COURT:  You know, you can fill it in while I'm

12   doing --

13          THE CLERK:  Okay.

14          THE COURT:  Okay.  All right, great.

15          All right, sir.  I want to go over the bond

16   conditions.

17          You are being released, but there is going to be some

18   certain conditions, okay?

19          Lynn, what is the courtroom number?  25 --

20          THE CLERK:  03.

21          THE COURT:  -- 03.  I know the chambers number.

22          So you must not violate any state, federal, or local

23   law while you are on release.

24          You must cooperate in the collection of a DNA sample,

25   which is available to you this afternoon -- or this morning

1    right now.

2            You must advise the Court or the Pretrial Services

3    Officer in writing before you make any change in your residence

4    or your telephone number.

5            And you must appear in court as required if you're

6    convicted and for any court appearances that I order on the

7    docket.

8            And you must surrender if you're convicted to serve

9    the sentence.

10           So you shall appear in Courtroom 2503 on April 30th at

11   10:00 a.m.

12           And you have some further conditions that I'm going to

13   review with you.

14           First, you shall surrender any passport to the

15   Pretrial Services Office.  You shall not obtain another

16   passport or another international travel document.  You shall

17   remain within the Northern District of Illinois.

18           Now, that's called a judicial district.  All right?

19   It's the top 18 counties of the State of Illinois.  If you have

20   any question about the parameters of the Northern District, ask

21   your attorney, ask Pretrial Services, so you don't have any

22   difficulty.

23           All right.  Do not possess a firearm, a destructive

24   device, or any other weapon.

25           And report as soon as possible to the Pretrial

1    Services Office or supervising officer every contact you have

2    with law enforcement personnel.  That means even questioning or

3    a traffic stop and definitely an arrest.

4         You shall surrender your FOID card and your CCL card

5    to the U.S. Pretrial Services Office.  And you shall transfer

6    possession of the firearms in your possession to a holder of a

7    FOID card -- can I say by March 11, Mr. Slaughter?

8         MR. SLAUGHTER:  I think that's appropriate, your

9    Honor.

10        THE COURT:  Okay.  Thank you.

11        So add by March 11, please.

12        THE CLERK:  I will, your Honor.

13        THE COURT:  Now, if you violate any one of these

14   conditions, what can happen is, one, I can put you in jail

15   prior to adjudicating the case, which is not helpful for

16   preparing; secondly, you could be charged with a new crime and

17   then face new criminal charges or even obstruction of justice.

18        Do you understand that that's a penalty, and these are

19   the court-ordered conditions, sir?

20        DEFENDANT KREJZA:  Yes.

21        THE COURT:  Okay.  I thought you said he was going

22   to -- oh, here it is.  Okay.

23        All right.  Now, what we have here is you're going to

24   be released on a $50,000 secured bond.  And it's secured by the

25   property located at 3934 West Argyle Street, Unit Two, Chicago,

```
 1    Illinois.  And it will be secured within seven days of your
 2    release.
 3              Now, do you have an agreement already on file with
 4    this?
 5              MR. NETOLS:  We do not.
 6              I know that co-counsel, defense counsel, has been
 7    dealing with Ann Bissell --
 8              THE COURT:  Yes.
 9              MR. NETOLS:  -- and I think the paperwork is all but
10    prepared.  I don't know if there's some additional materials
11    that might be needed to be supplemented.
12              MR. SLAUGHTER:  Actually, Judge, we have all the
13    paperwork prepared, and we're ready to tender it to the clerk.
14    I just talked to the clerk a few minutes ago.  He said as soon
15    as you enter the order, he can take that information.
16              THE COURT:  That's fantastic.  Okay, that's great.
17    Thank you very much.
18              All right then.  I think that's all set for him.
19              Anything else on this defendant?
20              MR. NETOLS:  No, your Honor, other than the
21    processing.
22              THE COURT:  Okay.  So processing with the marshals
23    needs to be done by March 11, okay?
24              Turning over the firearms by March 11th.
25              And turn the paperwork over to the Clerk of the Court
```

1    today.

2              MR. SLAUGHTER:  Yes, ma'am.

3              THE COURT:  All right.  Thank you very much.

4              MR. SLAUGHTER:  Thank you.

5              MS. PETERSEN:  He also just needs submit to his DNA

6    sample outside --

7              THE COURT:  And the DNA sample, Mr. Slaughter, right

8    outside?  You got that?

9              MR. SLAUGHTER:  We're going to do that.

10             THE COURT:  Thank you.

11             Next?

12             MR. NETOLS:  Next, if we could, can we go to

13   Mr. Kasprowicz next, your Honor?

14             THE COURT:  Okay.  Mr. Kasprowicz.

15             MR. SHEPPARD:  Yes, your Honor.

16             THE COURT:  Okay.  Thank you, Mr. Sheppard.

17             MR. SHEPPARD:  Good morning again, your Honor.

18             THE COURT:  Good morning.

19             MR. SHEPPARD:  Adam Sheppard on behalf of Boguslaw

20   Kasprowicz, who is present before the Court.

21             THE COURT:  Okay.  Good morning.

22             All right.  Do I have bond conditions here?

23             MR. NETOLS:  No, we don't, your Honor.

24             And do you have a copy of the Pretrial Services report

25   for this defendant?

1          THE COURT:  I do.  Hold on.  Give me a moment.

2          MR. SHEPPARD:  Your Honor, while that happens, may I

3     have leave of court to address Mr. Netols for a moment?  It's

4     about the Pretrial Services report --

5          THE COURT:  Sure.  I'm pulling it up anyway.  Go

6     ahead.  Go ahead.

7        (Counsel conferring.)

8          MR. SHEPPARD:  Thank you.

9          MR. NETOLS:  Your Honor, may I?

10         THE COURT:  Proceed.

11         MR. NETOLS:  The Pretrial Services report recommends

12    on the last page an unsecured bond and then some other

13    conditions.

14         We don't have any issues with the other conditions.

15    It's the unsecured bond.

16         And, you know, Pretrial Services reports are -- you

17    know, there's a lot of work put into them, but, ultimately,

18    they're based on what they hear from the defendants.

19         And in this case, the government's view is that this

20    defendant told material -- made material false statements to

21    Pretrial Services in order to obtain conditions of release that

22    would be beneficial to him.

23         And I can go through those briefly.  Actually,

24    Ms. Petersen has some of the individual documents that we can

25    show you, if we can proceed by that way.

1          THE COURT:  Yes, please do.

2          MR. NETOLS:  First of all, just when you look at the

3    factors in this case -- and I'll go quickly through the false

4    statements.

5          Mr. Kasprowicz is charged in Count Seven with

6    embezzling $14.3 million from Washington Federal Bank.

7          There's more than $60 million ultimately that I think

8    we'll prove that was embezzled, but that's what he received.

9          And what we're talking about here, your Honor, is not,

10   you know, numbers on a ledger somewhere.

11         We have traced $14.3 million from the bank to

12   Mr. Kasprowicz.

13         Mr. Kasprowicz did not make payments on this money.

14   He didn't pay taxes on this money.

15         And so based on that amount and the offense, the --

16   he's got a serious amount of money that is unaccounted for.  He

17   has conditions -- for family circumstances has relatives in

18   Poland.  He has significant travel.  We have the details that

19   Ms. Petersen can give you, but basically he travels to Poland

20   so much, he doesn't remember how much he traveled.  The last

21   time he traveled was in 2018.  He was a Polish citizen who was

22   naturalized here, so he's a dual citizen.  If he goes to

23   Poland, we will not be able to get him back.  Okay?

24         With respect to the penalty issues, the guidelines in

25   this case are, frankly, enormous.

1          Just going at some of the ones that do apply, a loss

2     of $60 million in total.  You're going to have a situation

3     where the financial institution failed.  And he got more than a

4     gross -- more than a million dollars of gross gain.

5          His guidelines will exceed the stat. maximums on the

6     30-year count.  So he's facing a serious amount of time.

7          The evidence against him -- and we're going to go

8     through some of that -- but, very briefly, he was interviewed

9     by agents in California.  He confessed, on tape, to taking --

10    embezzling the money from the bank, using it for his own

11    purposes, and not paying it back.  So the evidence against him

12    is overwhelming.

13         And then, your Honor, if you look at the statements

14    that were made -- and I'd like you to look, if you could, at

15    the top of page 3.  Ultimately -- and this relates to a

16    residence in California.  I'll wait until you -- do you see his

17    explanation for that --

18              THE COURT:  I do.

19              MR. NETOLS:  -- in the first paragraph?

20              THE COURT:  I do.

21              MR. NETOLS:  I'd like to go through that basically

22    piece by piece.

23              THE COURT:  Okay.

24              MR. NETOLS:  His statement that his wife purchased the

25    property in 2004 is false.  Frankly, it's ridiculous to believe

1    that she could have.  She's a teacher, at $3,000 a month.

2    She's buying the property for $720,000 in 2004.

3            Actually, we have the loan files in this case.  And

4    both Mr. Kasprowicz and his wife are both borrowers and on

5    title, instructions he signed, told them to put the title in

6    his name also.  We have a copy of the deed.  It was in his

7    name.  To the extent that it's in his wife's name now, if it's

8    been transferred based upon the CLEAR, that did not happen

9    until 2019, after the bank failed, after he knew he was under

10   investigation.  So he has made a false statement to the Court

11   about assets that he owns that are significant and could be

12   used to fund a flight.

13           We can show, by analyzing the money that

14   Mr. Kasprowicz received from the bank, that his primary,

15   basically only source was embezzled money from the bank for a

16   period of about 10 years.  And the money that he received, he

17   then provided money to his wife.  She essentially had no source

18   of income other than embezzled money from the bank.  The

19   payments on the mortgage on the house in California were made

20   with embezzled money from Washington Federal, and we can prove

21   that.  And we have a couple examples for your Honor that

22   Ms. Petersen can go through.

23           And so we have a situation here where he has made

24   significant false statements to Pretrial Services, which, as

25   you know, they work for you, it's the equivalent of him

1    standing here and lying to you.  He's already -- he's done

2    that.

3           So if you've got a situation where you want to ask

4    yourself, well, despite his lack of criminal history, one of

5    the first questions you want to ask yourself is how is he

6    reacting to his encounter with the justice system?  Here's his

7    encounter with the justice -- his reaction is to lie to get

8    what he wants.  That's not a good sign on someone who should be

9    on unsecured bond.

10          Finally, the other matter is that he's got two

11   children who live in Poland.  We have Mr. Kasprowicz sending at

12   least $884,000 to his two children who live in Poland.  So he's

13   got people who are of means over there who can help take care

14   of him.

15          THE COURT:  Are you going to support these statements

16   with evidence --

17          MR. NETOLS:  Yes, and we can do that right now, your

18   Honor.

19          THE COURT:  Yes.  I think you need to do so, please.

20          MS. PETERSEN:  Your Honor, I'm going to pass up a copy

21   of the exhibits to your Honor.

22          THE COURT:  Thank you.

23          MS. PETERSEN:  Also a copy to counsel.  And I don't

24   know if it's easier if I use the Elmo to walk you through some

25   of this?

1          THE COURT:  That's fine, that's fine.  You can --

2          MS. PETERSEN:  I just have to ask Mr. Sheppard if he

3     would switch places.

4          THE COURT:  Let me make sure the -- are the TVs on?

5          THE CLERK:  Let me double-check, your Honor.

6          THE COURT:  Hold on just a second while she turns on

7     the monitors.

8          MR. SHEPPARD:  Your Honor, may I have leave of court

9     to sit down?

10          THE COURT:  Oh, of course.

11          MR. SHEPPARD:  I have a pinched nerve in my -- thank

12     you.

13          THE COURT:  Oh, I know how that is.

14          Anyone else who would like to sit, you may sit if

15     we're not handling your case right now if you would like.

16          Don't leave, Mr. and Ms. Kowalski.  Just sit.

17          Okay, have a seat.

18          You may proceed.

19          MS. PETERSEN:  Yes, your Honor.

20          I'm going to walk you through some of these exhibits.

21     They are labeled, so I will refer to them by exhibit number as

22     I go.

23          So during sort of between 2009 and the failure of

24     Washington Federal, which was at the end of 2017,

25     Mr. Kasprowicz owned a company called Thomas Development, and

1    it had two bank accounts, not at Washington Federal.

2              Those appear to be the primary accounts that he used

3    for all his expenses, personal and otherwise.

4              And we have done an analysis of the funds coming into

5    those account, and I'm -- as I'm going to walk you through,

6    that's Government Exhibit BK-1.  Let me zoom out.  And

7    essentially BK-1 traces funds into and out of these two

8    accounts during this time period.

9              If we go to the very last page, we see that during

10   this time period 2009 to 2018, a little over $14 million is

11   deposited into this account.

12             And if we flip to the prior page, we can see that if

13   we trace the funds that come from Washington Federal, 14.3

14   million of that is from Washington Federal.  So, you know, well

15   over 95 percent of all the funds that Mr. Kasprowicz receives

16   during this time period comes from Washington Federal.

17             Mr. Netols mentioned payments out to his adult

18   children that live in Poland.  They're on this chart as well.

19   There's -- sorry.  There's funds to Karol Kasprowicz.  Over

20   $558,000 goes to him; and his daughter Ewa, E-W-A, over

21   $284,000 goes to her.

22             These funds that come from Washington Federal to

23   these -- through these two bank accounts are used to pay

24   mortgage payments both on his residence in Chicago and this

25   residence at issue in California.

1      Before I get into that, I want to walk you through a

2 couple of the documents from the loan file for the California

3 home.

4      That's marked Government Exhibit BK-2.

5      The first page of BK-2 are the escrow instructions for

6 this -- for this property.  This is back in 2005.  And the

7 buyers -- or -- instructed their lender to title this property

8 in both Mr. Kasprowicz's name and his wife's name, and their

9 initials are at the bottom initialing that that's how they

10 wanted the property to be titled.

11      Indeed, page 2 is the deed that is how the property is

12 titled.  This property in California was titled in both

13 Boguslaw Kasprowicz's name and his wife's name.

14      During the loan application process, the lender asked,

15 you know, Ms. Kasprowicz where the source of her funds was.

16 She provides a letter about an account at Founders Bank.

17 That's the bank -- one of the bank -- that's the bank where

18 Thomas Development had one of its bank accounts.  And she says

19 that her source of business is the real estate development

20 business.  She's referring to this pool of money that she

21 shares with her husband.  His statement to Pretrial Services

22 that they keep their finances separate is not accurate.  It's

23 his and her money used to buy the bank -- used to buy this

24 property.

25      And on the next page, we see a similar representation

1   made to the lender that the source of the funds for

2   Ms. Kasprowicz is that she's a part owner of Thomas

3   Development.  Thomas Development is that entity that's getting

4   all of that embezzled money from Washington Federal.

5             After this is the mortgage.  It's lengthy; but if we

6   flip to the back page, we see that both the Kasprowiczs sign

7   the mortgage.

8             Once they own this property in California, it is funds

9   from Washington Federal that are used to make mortgage

10   payments, sometimes directly and sometimes indirectly.

11             Government Exhibit BK-3, 4, and 5 are examples of

12   where cashier's checks were obtained from Liberty Bank and were

13   used to make mortgage payments for this California residence.

14             The funds from this, if you flip to the second page or

15   third page from the statement, the funds for these cashier's

16   checks come directly from the Thomas Development account at

17   Liberty Bank.

18             And as your Honor saw in the first exhibit, 95 or

19   more percent of those funds came from Washington Federal.

20             I just pulled a few examples where Mr. Kasprowicz is

21   making mortgage payments for this California property.  BK-3, a

22   2014 payment of over $64,000.  BK-4, a mortgage payment of over

23   $32,000.  And BK-5 is a mortgage payment of over $64,000.

24             And, again, during this time period, this money is

25   coming from Washington Federal through Mr. Kasprowicz.

1         Government Exhibit BK-7 is just an example of sort of

2    the amount and volume of checks that Mr. Kasprowicz was getting

3    from Washington Federal.

4         This is just in a -- in a few short weeks' time, page

5    1, he gets $38,000 from Washington Federal on January 14th,

6    deposits it into that Liberty Bank account.  He gets $42,000 on

7    January 14th, deposits it into the Liberty Bank account.

8    January 29th, he gets $28,000 from Washington Federal, and

9    deposits it into the bank account.

10        And this is just a snapshot -- oh, wait.  Sorry.

11   There's one more check, I believe.  Yes.  And he gets, lastly,

12   on that same day, he gets another $48,000.

13        And this pattern of checks, large checks, this is just

14   from one month, but it happens month after month from

15   Washington Federal.  Those funds are used to pay the mortgage.

16        He also -- I'm going to go back to BK-1.  You know, he

17   told Pretrial he keeps his funds separate from his wife, they

18   keep their finances separate.  But as we can see in this chart,

19   during this time period, he transferred or wrote checks to her

20   in over $1.8 million.

21        And sometimes there are times when, after she receives

22   those checks, she deposits them into her own Chase bank

23   account.  One example of this is BK-6.  Almost all of the --

24   almost all of the funds coming -- almost 100 percent of the

25   funds this month coming into this account are from that Thomas

1    Development account at Liberty Bank, and she uses those funds

2    to make mortgage payments on the California property.  There's

3    an example on page 3 of such a direct deposit coming out.  This

4    trend happens over and over.

5           And so his statements to Pretrial Services about the

6    California residence and his wife's separate funds is just

7    simply not true.  This is an asset he purchased largely with

8    embezzled funds, and he was hiding it from your Honor.

9           THE COURT:  Okay.  Would you like to respond, sir?

10          MR. SHEPPARD:  Yes, your Honor.  Thank you.

11          THE COURT:  Okay.

12          MR. SHEPPARD:  I think just in terms of framing the

13   issue, I just want to confirm.  I think the government's

14   request is it's the issue of should it be an OR bond or a

15   property bond.  And if the Court is considering -- a secured

16   bond, I should say.  Let me say, we're not proposing this

17   property in California at all.  I understand that could be the

18   subject of this case based on --

19          THE COURT:  Right, I mean, you've got a really sticky

20   problem if the properties that he owns are all linked to the

21   alleged criminal activity.

22          MR. SHEPPARD:  That would not be the property that

23   we're proposing if, in fact, it's required.

24          The property that we would be proposing would be from

25   his sister who owns a residence who I spoke to yesterday.  So

1    in the event that if a property -- or a secured bond is

2    ordered, our request would be for a short period, just to

3    get -- speak with Ms. Bissell, have -- get an appraisal and all

4    the other requisite documents --

5              THE COURT:  Do you know how much equity is in that

6    property?

7              MR. SHEPPARD:  She thought it was in excess of 50,000.

8              Mr. Netols and I have been in discussion about this

9    issue.

10             And let me say this.  Mr. Kasprowicz has known about

11   the investigation since 2018.  I was at a meeting at the U.S.

12   Attorney's Office over a year ago.  We surrendered his

13   passports, I did, to the U.S. Attorney's Office, I think it was

14   in July.  So in terms of a flight risk, I think that

15   Pretrial -- he surrendered both passports, Polish and

16   United States.  So in terms of a flight risk, I think that

17   Pretrial has got it right.

18             As to the allegation of the misstatement, I note in

19   that line, he didn't say that -- he said he thought that the

20   property is in her name, not back when it was purchased.  They

21   used the word "is" in the pretrial report.  And there hasn't

22   been contrary evidence presented, I think.  And

23   Mr. Kasprowicz's understanding is that it's currently in a

24   living trust in her name.  That's his recollection.  And that's

25   what he was trying to convey to Pretrial.

1          THE COURT:  Well, the second line is problematic then

2     because he says "she" purchased it in 2004 for 720,000, and

3     that their finances are separate.

4          MR. SHEPPARD:  Right.  His recollection -- I know this

5     particular Pretrial Services Officer is very experienced and

6     terrific and -- this was done on a telephone call as opposed --

7     because of COVID, of course.  His recollection, he thought he

8     said "we" as opposed to "she."  I don't know, Ms. Tramonte is

9     not here to --

10          THE COURT:  I don't know.  Is she?

11          Ms. Tramonte?  Are you on the telephone, Ms. Tramonte?

12          PRETRIAL SERVICES OFFICER:  Good morning, your Honor.

13     This is Carla Tramonte, Pretrial Services.

14          THE COURT:  Thank you.

15          I take it that you stand by the report as written,

16     Ms. Tramonte?

17          PRETRIAL SERVICES OFFICER:  Yes, your Honor.  He did,

18     to my recollection, say "she."  And I will note for the Court,

19     your Honor, I didn't ask additional follow-up details as to at

20     the time of purchase was there any difference versus now.  I

21     took that information and then moved on to the next question.

22          THE COURT:  No problem.  Thank you very much.

23          MR. SHEPPARD:  As to the issue about the finances

24     being separate, I think what he was referring to, they have

25     a -- she has a Chase bank account apparently that he's not on,

1    so -- but, regardless, the -- in terms of what makes him a risk

2    to violate any conditions of bond, I think perhaps the

3    discrepancy -- of course, I recognize that's a possibility --

4    as to the weight of the evidence, that's one factor, of course,

5    the Court can consider, but I would say that's offset by the

6    fact he's known about the weight of the evidence.  And I'm

7    going to say, there was a reverse proffer in the case over a

8    year ago.  He knows exactly the weight of the evidence, and he

9    still didn't flee.

10           As for travel to Poland, that's where his son, who is

11   a physician there in Poland, lives and his daughter, and he

12   came back every time.

13           As to his assets, the government has done a thorough

14   job of seemingly locating them.  And the evidence that was just

15   presented showed a lot of expenditures, I agree with that, and

16   even sending overseas.  But what's left to -- that hasn't been

17   shown.  He's been honorable, Mr. Kasprowicz, in all of his

18   obligations, including in responding to the subpoena duces

19   tecum issued by the United States Attorney's Office.  He didn't

20   just assert the Fifth with respect to production of documents.

21   He produced, and as hard as that may be sometimes, but he

22   produced the documents that were responsive to the subpoena.

23   You heard that he was cooperative with agents.  Apparently, the

24   government described it as a confession.  I'd say that shows

25   acceptance of responsibility if, in fact, that is the case.

1    And he hasn't fled in any way.

2            We would ask the Court to concur with the Pretrial

3    recommendation.

4            As -- if there is going to be a property bond, we

5    would ask just for -- I'm going to suggest a week's time, may

6    it please the Court, in order for us to have the documents in

7    order.

8            THE COURT:  Okay.  I don't need a reply.  Okay?

9            I do think he needs a property bond based upon -- and

10   I'm admitting BK-1 through BK-8 as support for my decision, as

11   well as the proffer of the admission statement by Ms. Petersen.

12   The weight of the evidence is strong.  The amount of money that

13   has been transferred is extremely high.  And the dual

14   citizenship is an extreme flight risk to the Court.  Having

15   surrendered a passport is fine and wonderful, but I have plenty

16   of false production of identification document cases day in and

17   day out.  And someone with money and ties to another community

18   can move very easily without difficulty.

19           He will -- I think he should have GPS monitoring.

20           MR. NETOLS:  Yes, your Honor.  We do --

21           THE COURT:  And so my two conditions will be some kind

22   of bond supported by whatever property -- and you can work that

23   out with each other for the next seven days -- but it will be a

24   release with that condition as well as GPS monitoring.  Okay?

25           MR. SHEPPARD:  Thank you.

1          THE COURT:  Now, as far as the other conditions, shall

2     I go through those now?  Or shall we continue this hearing

3     until next week when everything is together?

4          MR. NETOLS:  Well, I think our preference would be

5     that you go through them now, that he be put on ER -- or EM,

6     and that we follow up just on the issue of the security.

7          THE COURT:  Okay.  All right.  So, sir, could you

8     please stand up here and be before the Court?  And may I have

9     the conditions for him?

10         MR. NETOLS:  Yes, your Honor.  These are the

11     conditions.  They obviously don't include the monitoring.

12        (Documents tendered to the Court.)

13         THE COURT:  Thank you.

14         All right, Mr. Kasprowicz, first and foremost, you

15     must not violate any federal, state, or local crime while you

16     are on release.

17         You shall cooperate in the collection of a DNA sample,

18     and that's out in the hallway today.

19         You shall advise the Court or the Pretrial Services

20     Office -- or officer in writing before you make any change in

21     your residence or your telephone number.

22         And you must appear in court as required.

23         Your next court appearance is April 30th at 10:00 a.m.

24     in this courtroom.

25         And you must surrender if you are convicted to serve a

1      sentence if you are convicted.

2                  Aside from that, the other conditions will be to

3      submit to supervision by the Pretrial Services Officer.

4                  Surrender any passport or international travel

5      document to Pretrial Services, and not obtain a passport or

6      other international travel document.

7                  You shall not possess a firearm, destructive device,

8      or other weapon.

9                  And you shall report as soon as possible to Pretrial

10     Services if you have any interaction with law enforcement,

11     traffic stop, questioning, even an arrest.

12                 Now, I'm going to require that you post a bond.

13                 Mr. Netols, have you discussed what the amount will

14     be?

15                 MR. NETOLS:  You know, we had some discussions before

16     he made his false statements to Pretrial Services.

17                 Your Honor, we think it should be up to $100,000 bond.

18     I think --

19                 THE COURT:  Okay.  What I'm going to do is today I

20     will say $100,000 secured bond.  But I understand you'll be

21     working with each other and that might be modified.

22                 I also require that you are going to be monitored by

23     the Pretrial Services Officer with GPS monitoring system.

24                 And if you violate any one of these conditions of

25     release, you can first go to jail before the case is

1    resolved -- which makes it very difficult, as you know, to work

2    with your attorney -- but you could also be charged with

3    another crime.  You could be charged with obstruction of

4    justice.

5                   Do you understand that those are your conditions, sir?

6                   DEFENDANT KASPROWICZ:  Yes, your Honor.

7                   THE COURT:  Okay.  All right then.  What is a week

8    from today?

9                   THE CLERK:  March 11th, your Honor.

10                  THE COURT:  Okay.  So March 11th.  Do you have a time

11   that we can --

12                  THE CLERK:  We can do it at 9:30.

13                  THE COURT:  9:30.  Okay?

14                  MR. SHEPPARD:  Your Honor, would that be in person?

15                  THE COURT:  I'm here that day, right?

16                  THE CLERK:  Yes.

17                  THE COURT:  Yes, it will be in person.

18                  MR. SHEPPARD:  I have a hearing that's going to run

19   over, but perhaps my partner can cover.

20                  THE COURT:  Well, if you want a different time, I can

21   do a different time.

22                  MR. SHEPPARD:  Is there something later in the day in

23   the afternoon on the 11th, may I inquire?

24                  THE CLERK:  Yes.  We can do -- you have the

25   naturalization ceremony, so we could do 12:30 or 12:00.

```
1              THE COURT:  Sure.  12:30, does that work?
2              MR. SHEPPARD:  Yes, thank you.
3              THE COURT:  12:30.
4              MR. NETOLS:  May I -- if I could also inquire.
5    Perhaps counsel should be told that -- I'm not sure what he's
6    going to post.  I'm not sure who has a joint interest.  But to
7    the extent that someone else is going to put their property at
8    risk, I think your Honor would want them here --
9              THE COURT:  Oh, yes.
10             MR. NETOLS:  -- to be told --
11             THE COURT:  You have to have them here so that I can
12   make sure that they understand that, okay?
13             MR. SHEPPARD:  (Nods affirmatively.)  Thank you, your
14   Honor.
15             THE COURT:  Okay.  So he can be released.
16             And you can be excused until then, okay?
17             MR. SHEPPARD:  Thank you very much.
18             THE COURT:  All right.  Thank you very much.
19             PRETRIAL SERVICES OFFICER:  Your Honor, this is Carla
20   Tramonte, Pretrial Services.
21             THE COURT:  Yes, thank you.
22             PRETRIAL SERVICES OFFICER:  May we ask, your Honor,
23   the level of location monitoring?  I know you said GPS.  It
24   would be home incarceration, home detention, or curfew, your
25   Honor.  We have a recommendation, and we're just asking your
```

1     preference.

2              THE COURT:  Say the levels again.

3              PRETRIAL SERVICES OFFICER:  Sure.

4              The highest level is home incarceration, and that

5     individual would not be able to leave the house for work.

6              Home detention would allow for work or school.

7              And curfew as directed, we will be monitoring that

8     individual, and they would not be allowed to work.

9              I've spoken with a colleague who is also on the line

10    in this case, and he is asking us to have a recommendation to

11    your Court to have curfew as directed by Pretrial Services.

12             We would ask for verification of your Honor if you

13    would agree to that.

14             THE COURT:  And if I say curfew, am I saying home

15    detention with a curfew?  Or is it -- is it three separate

16    proposals?  Either curfew, home detention, or home

17    incarceration?  Is that what you're saying?

18             PRETRIAL SERVICES OFFICER:  You're correct, your

19    Honor.  There's three separate levels to location monitoring,

20    the highest being incarceration --

21             THE COURT:  No, that's fine.

22             Mr. Netols?

23             MR. NETOLS:  If you can consider perhaps maybe a

24    higher level until the property is posted; and once the

25    property is posted, then something --

1    THE COURT:  Okay.  I'll do home detention today.  And

2    then next week -- and that means you get to be free to work.

3    But at next week, we can maybe change that to curfew once the

4    property is posted.  Okay?

5            PRETRIAL SERVICES OFFICER:  Thank you, your Honor.

6            THE COURT:  You're welcome.

7            MR. SHEPPARD:  Given that then, would he need to be

8    affixed today with --

9            THE COURT:  Ms. Tramonte?

10           PRETRIAL SERVICES OFFICER:  Yes, your Honor.  We have

11   an individual in our office.  If he could step down to the 15th

12   floor, I will message him to expect our defendant, and we will

13   affix the transmitter to him.

14           THE COURT:  That's fantastic.  Thank you very much.

15           Okay?  15th floor.

16           MR. SHEPPARD:  Thank you, your Honor.

17           THE COURT:  Okay.  We have a complication for

18   continuing it this very moment, which is that this is the

19   American Bar Association's Judicial Outreach week, where judges

20   are speaking to students about the rule of law, and I've

21   committed to speak to high school students at 11:00.  So,

22   unfortunately, I have to break and come back after that

23   commitment.

24           And so Mr. Kowalski and Ms. Kowalski, I need you to be

25   back here at 1:00 p.m., okay?

1          DEFENDANT ROBERT KOWALSKI:  Yes, Judge.

2          THE COURT:  And for the rest of you who have other

3    issues, we're going to reconvene at 1:00.  I apologize for the

4    break, but I gave some pro bono time to a bunch of high school

5    kids for two classes.  Okay?

6          MR. NETOLS:  So our understanding is the only other

7    would be Mr. Matczuk whose bond conditions we need to address.

8          THE COURT:  I didn't hear you.

9          MR. NETOLS:  I said so the only other defendant left

10   is Mr. Matczuk whose bond conditions you have yet to address.

11         THE COURT:  Well, I have to talk -- I have to read

12   Mr. Kowalski his superseding indictment, I have to deal with

13   Ms. Kowalski's pretrial report, and that one defendant.  Okay?

14         So 1:00 o'clock we'll reconvene.

15         Thank you.

16         MS. PETERSEN:   Thank you.

17         THE CLERK:  All rise.  Court is in recess until

18   1:00 o'clock.

19       (Recess at 10:57 a.m., until 12:59 p.m.)

20         THE COURT:  I'd like you to file this under seal on

21   the docket since it supports the ruling, please.

22         MS. PETERSEN:  Yes, your Honor.

23         MR. PISSETZKY:  I was supposed to have a sentencing

24   hearing yesterday in front of Judge Wood.  And for the first

25   time in over a year, I got dressed up, put my cuff links on,

1    everything, ready to leave the house, and I get an email from

2    her clerk saying my client refused to come to an in-person

3    sentencing hearing.

4         (Laughter.)

5         MR. PISSETZKY:  I was so excited yesterday.

6         THE COURT:  Well, you look very nice today,

7    Mr. Pissetzky.

8         MR. PISSETZKY:  Thank you, your Honor.

9         THE COURT:  Doesn't it feel good?

10        MR. HYMAN:  Well, at least we found out, Judge, that

11   at least the suit fits.

12        (Laughter.)

13        THE COURT:  That's exactly right.  That's a good

14   thing, Mr. Pissetzky.  Everybody is putting on their suits

15   saying uh-oh.

16        When you are ready, Lynn, we'll call the case, but not

17   until you're ready.

18        THE CLERK:  19 CR 226, Defendant 1, 2, and 10,

19   U.S. versus Robert Kowalski, Jan Kowalski, and Marek Matczuk.

20        THE COURT:  Good afternoon.

21        For the record, please state your names again.

22        MR. NETOLS:  Brian Netols, N-E-T-O-L-S, on behalf of

23   the United States.

24        MS. PETERSEN:  Michelle Petersen on behalf of the

25   United States, your Honor.

1          THE COURT:  Good afternoon.

2          MR. HYMAN:  May it please the Court, Lawrence Hyman,

3    H-Y-M-A-N, one of the attorneys for Mr. Matczuk.

4          THE COURT:  Good morning -- or afternoon.

5          MR. PISSETZKY:  And Gal Pissetzky, your Honor.

6          THE COURT:  Good afternoon.

7          DEFENDANT ROBERT KOWALSKI:  Good afternoon, your

8    Honor.  Robert Kowalski.

9          THE COURT:  Good afternoon.

10         MR. CHIPHE:  Good afternoon, your Honor.  Imani Chiphe

11   from the Federal Defender Program as standby counsel for

12   Mr. Kowalski.

13         THE COURT:  Good afternoon.

14         MR. STANTON:  Good afternoon, Judge.  Bill Stanton,

15   S-T-A-N-T-O-N, on behalf of Jan Kowalski.

16         THE COURT:  Okay.  The Kowalskis and counsel can sit

17   down while we deal with this, and then we'll get to you next,

18   okay?

19         All right.  Mr. Netols, your position on release or

20   detention?

21         MR. NETOLS:  Your Honor, we think that there's some

22   conditions, if I -- the short story is we've had some

23   discussions.  I think we've found a resolution with, if it's

24   acceptable to the Court, or may need some input from the Court.

25         Our concern is that an OR is just not sufficient.  The

1  charges are embezzling $8 million.  He is a foreign national.

2          His situation -- you know, we have some concerns

3  because he's, you know, represented that he's disabled and I

4  think he's had some illness, but we have some differences of

5  opinion about whether he's still working.

6          All that being said, our position is OR isn't

7  sufficient.  We've talked with defense counsel.  It doesn't

8  appear that there's anything that he can post.

9          In light of that -- your Honor understanding kind of

10  the dynamics of the case, all the same issues are there as far

11  as penalty and evidence and all that kind of stuff -- we think

12  it needs to be more than OR.  We were going to suggest maybe

13  electronic monitoring, maybe co-signer, just some -- we need

14  something in the middle.  And I don't know what your Honor is

15  going to accept, frankly.  But we -- I don't think we need to

16  argue over anything other than we need something that makes the

17  Court comfortable that he's going to be here.

18          THE COURT:  Well, we do have foreign family ties like

19  the previous defendant, correct?

20          MR. NETOLS:  Yes.

21          MR. PISSETZKY:  There's one, your Honor.

22          THE COURT:  Okay.

23          MR. PISSETZKY:  His brother.  He hasn't seen him since

24  before -- sometime around 2017.  So that's the only foreign tie

25  there is.  Everything else -- he's been here since 1986 or 9.

1    And I have all his passports here, your Honor.

2          He -- in fact, ever since he learned of the

3    investigation, he has not left the country.  His wife went out

4    to Poland once, but he stayed behind.  He has not left the

5    country at all.

6          We actually provided the government with information

7    that they wanted.  A lot of documents.  He has been here.

8          He has a lot of medical conditions, your Honor.

9          As I wrote in my memo, we are not objecting to,

10   although Pretrial suggests some conditions, these are all fine

11   with us, your Honor.

12         We're ready to turn over the passports today.

13         If your Honor is entertaining some sort of a GPS

14   monitoring, I would ask that it would be a curfew.  Because of

15   his medical conditions, he does need to leave the house and

16   walk and be active.

17         THE COURT:  Okay.  So I don't know if I have much

18   detail about any medical conditions other than that he had had

19   this stroke, and I don't know anything about the mental health,

20   so --

21         MR. HYMAN:  If I may, I have a summary, a health

22   summary, of his current issues that start with acute systolic

23   heart failure, hypertension, hyperlipidemia.

24         May I pass it up to your Honor?

25         THE COURT:  Yes, I would be interested, please,

1    through the courtroom deputy.

2         (Documents tendered to the Court.)

3              THE COURT:  Thank you.

4              MR. HYMAN:  He's on multiple insulin shots, along with

5    his medication that are numerous, from Lipitor to Coreg,

6    C-O-R-E-G, to Cozar, C-O-Z-A-R, to Xarelto, to BD UF pen

7    needles for blood glucose.  There's -- it's quite -- it's quite

8    a list.  And I can let Mr. Netols see it.  He's familiar with

9    many heart issues himself.

10        (Documents tendered to the Court.)

11             MR. PISSETZKY:  We can also certainly propose his wife

12   as a third-party custodian, your Honor.

13             THE COURT:  What does she do?

14             MR. PISSETZKY:  She's an independent appraiser for

15   real estate --

16             THE COURT:  Real estate?

17             MR. PISSETZKY:  Yes.

18             THE COURT:  In the area?

19             MR. PISSETZKY:  In the area, yeah.  They live in Park

20   Ridge, your Honor.

21             And as you know, most of the things that are done

22   today are done remotely.

23             THE COURT:  I'm thinking maybe what would give me

24   better comfort level would be the custodian and maybe a $10,000

25   bond so that there's something posted.

1           Do you have the ability to secure a $10,000 bond?

2           MR. PISSETZKY:  You know, it is going to be extremely

3    difficult.  I'm -- your Honor, he has literally nothing.  He

4    doesn't -- the home that they live in was foreclosed on, taken

5    away.  They still live there because they got to some

6    settlement, but they're now in two months' arrears on that

7    settlement.

8           MR. HYMAN:  And it's only -- it's only Mrs. Matczuk,

9    your Honor, who is attempting to pay for that -- that monthly

10   payment towards the foreclosed or property --

11          THE COURT:  Okay.

12          MR. HYMAN:  -- and she just sort of -- and they have

13   three children that still live there, adult children who live

14   there.  Now, they're all still under one roof.  And they just

15   have part-time jobs.

16          THE COURT:  I just don't know whether the electronic

17   monitoring with the health conditions is as easy to do.  I

18   don't know.

19          MR. NETOLS:  Well, your Honor, I -- and, again, this

20   is not going to change our position.  But, ultimately, I should

21   let you know that we had the defendant on -- the FBI

22   surveillance squad followed him around.  And during the time

23   that he said he's disabled, they observed him driving, going to

24   suppliers, going to construction sites, talking to people,

25   clearly supervising them.

1    So our position is -- I'm not going to argue that he

2    has these health issues; but our position is we've seen him

3    working, we've seen him getting around.  I would be, frankly,

4    more comfortable if he said, listen, I have -- the guy has to

5    leave because he's got some work somewhere.  But the reality is

6    he's working.

7    That being said, I have the same concerns you have

8    about, you know -- I mean, if he's got ER -- if he's got EM,

9    rather, if he can just give a schedule, that's fine.  I don't

10   know -- I don't see anything on there from my experience that

11   would require continuous visits to the doctor on his heart, you

12   know, whatever those heart situations are.  It looks like it's

13   all maintenance.  And so, you know, if -- we would be in the

14   same view.  Something at risk.  I don't know if he's got

15   anything to post at risk, but -- EM, custodian.  But when the

16   custodian is the wife and may have the same interests in him

17   not appearing or be -- and have nothing at stake, it doesn't

18   leave us with much.

19   I will say we're much less concerned than we are -- we

20   were with Mr. Kasprowicz.  He got -- 8 million is still a lot

21   of money, but it's less.  And it appears that, for example,

22   that house was paid for by bank proceeds.  And it looks like

23   when the bank failed and his source of embezzled money left, he

24   basically dwindled it all away.  And so I don't -- I'm less

25   concerned that he's got the ability to flee.  We're less

1    concerned that he's got relatives in Poland to whom he sent a

2    lot of money.  So it's a little different.  But I --

3    THE COURT:  So my electronic monitoring reasoning for

4    the previous defendant was that this significant amount of

5    funds was available both overseas and here.  And facing these

6    very significant charges now with a significant penalty, the

7    motivation to potentially get false identification in order to

8    go to Poland and we wouldn't be able to return him is

9    significant.  This defendant I don't think you're saying has

10   that same ability to get funding.

11   MR. NETOLS:  Not to the same extent.  Exactly.

12   THE COURT:  Yes.  So I think that under those

13   circumstances, I'm not going to put him on that electronic

14   monitoring because he has less likelihood of fleeing for that

15   reason.

16   I think we should put -- I think we should have his

17   wife come in as a custodian.

18   I am a bit skeptical, as Mr. Netols might be, that her

19   interests might be the same, but she can stand before the Court

20   and tell me.  All right?  So I'll give her a custodian

21   position.  So we'll have to have him come back with her, okay?

22   I will put you on bond today, sir, and then we'll have

23   to have another hearing after that.

24   So if I could have his form, please?

25   MR. NETOLS:  Your Honor, I'm going to tender a copy of

1    the order setting conditions and an appearance.  But I will say

2    that the ordered set of conditions was a bit more of a work in

3    progress because we didn't see the Pretrial Services report.

4    It came up right when the Court was called, right beforehand.

5    But here's two copies.

6            I would think we would request, though, you know, some

7    kind of reporting to Pretrial Services if he's not on EM, some

8    kind of reporting.

9            THE COURT:  Okay.  Mr. Matczuk, I'm going to place you

10   on an unsecured bond.  Hold on just a second.  And we'll have

11   to change this.  This is marked differently.

12           MR. NETOLS:  The conditions are a little closer.  They

13   seem to mirror -- we tried to make them mirror the other

14   defendants, having not seen this --

15           THE COURT:  Right.  Okay.  I'm going to place you on

16   an unsecured bond.  Sir?  Okay.  And you need to look this way,

17   okay?

18           This bond is going to require that you appear for all

19   of your court proceedings.  The next one is April 30th at 10:00

20   a.m.  And if you are convicted, to surrender to serve your

21   sentence.

22           You must comply with the following conditions of

23   pretrial release:

24           You shall submit to supervision by and report for

25   supervision to the Pretrial Services Office as directed.

1      You shall surrender any passport to the Pretrial

2  Services.  You shall not obtain another passport or another

3  international travel document.  And you shall remain within the

4  Northern District of Illinois.  That is a judicial district.

5  That district comprises the top 18 counties of the State of

6  Illinois.  If you do not know what counties those are, please

7  ask your lawyers or the Pretrial Services Officer to be certain

8  you stay within that area.

9      You shall not possess a firearm, destructive device,

10  or other weapon.

11      And you shall report as soon as possible to the

12  Pretrial Services Office or supervising officer every contact

13  with law enforcement, including questioning, arrests, or

14  traffic stops.

15      I'm going to have your wife come in next week because

16  she is going -- you will be placed in her custody in the sense

17  that she is going to agree to supervise you.  And she's going

18  to use every effort to assure your appearance at all of the

19  court proceedings.  And she is to notify the Court if you

20  violate any condition of this release.

21      Now, if you violate a condition of release, you can be

22  placed in jail prior to the adjudication of this case.  That's

23  not a good thing to do because you need to be working with your

24  attorneys now.

25      Also it could result in further criminal charges, or

1    it could result in obstruction of justice charges.

2            Do you understand that, sir?

3            DEFENDANT MATCZUK:  Yes.

4            THE COURT:  Okay.  Has he been processed?

5            MR. HYMAN:  No, Judge.  I spoke to the marshal

6    supervisor earlier, and I filled out the form she gave me, so

7    I -- she was going to get back to me to let me know, and I

8    haven't heard whether we can go up there.

9            THE COURT:  Okay.  You can find out --

10            MR. HYMAN:  The FBI was here, but they didn't have the

11    equipment to do any of the DNA swabbing.

12            THE COURT:  Okay.

13            MR. HYMAN:  In fact, they just said, oh, when you get

14    your appointment, call us and we'll go up.

15            THE COURT:  Okay.  I'm going to require that he be

16    processed and have his DNA testing by March 11th.  Okay?

17            MR. PISSETZKY:  What day should we come back, your

18    Honor?

19            THE COURT:  Lynn, what does it look like for us?  The

20    10th or 11th, I think?

21            THE CLERK:  The 11th you're in, your Honor.  And I

22    believe we set the other person at --

23            MR. PISSETZKY:  9:30.

24            THE CLERK:  9:30, yes.

25            THE COURT:  Yes, that's fine.

1          MR. PISSETZKY:  I have a 9:30 in front of Judge Lee.

2    Can we have it maybe at 10:00 o'clock?

3          THE COURT:  Sure, that's fine.

4          Anything else for this defendant?

5          MS. PETERSEN:  I don't believe so.

6          I think time was excluded already, your Honor, but --

7          THE COURT:  Time is excluded for everyone --

8          MS. PETERSEN:  Okay.

9          THE COURT:  -- until April 30th.

10         MS. PETERSEN:  I don't believe we have anything else.

11         MR. PISSETZKY:  Do you want us -- your Honor, do you

12   want us to execute the bond now?

13         THE COURT:  Yes, I do.

14         MR. HYMAN:  There's some changes that need to be made.

15         THE COURT:  Don't leave the courthouse until we get a

16   signed copy, okay?

17         MR. PISSETZKY:  Thank you, your Honor.

18         THE COURT:  All right.  Thank you.

19         We can go to the next defendant while we're doing

20   that, please.

21         THE CLERK:  19 CR 226, Defendant 2, U.S. versus Jan

22   Kowalski.

23         I'm going to remind parties that are on the line to

24   please mute their phones.

25         Good afternoon.  This is Lynn, Judge Kendall's

1    courtroom deputy.

2           Whoever is on the teleconference line, please mute

3    your phone if you are just listening in.  Thank you.  We keep

4    hearing a little beeping.

5           THE COURT:  Okay.  Good afternoon.

6           MR. STANTON:  Good afternoon.

7           THE COURT:  All right.  We have just one matter.  I

8    did receive this report from Pretrial Services.

9           Do I have the Pretrial Service Officer on the phone

10   now?

11          PRETRIAL SERVICES OFFICER:  Good afternoon, your

12   Honor.  Ashley Simon, Pretrial Services.

13          THE COURT:  Thank you.

14          So this report came to me early this morning.  And it

15   was a failure to report interaction with law enforcement.  And

16   so I'm going -- isn't that right?

17          MR. STANTON:  No, Judge.

18          THE COURT:  Oh.

19          MR. STANTON:  Judge, Ms. Kowalski self-reported that

20   she had been involved in an accident that occurred in Indiana.

21          THE COURT:  Oh, she self-reported.  And for some

22   reason did not use her correct name, which is an oddity.  I'm

23   not sure what that's about.

24          Let me hear from Mr. Netols first, and then you can

25   respond.

1      MR. NETOLS:  Your Honor, I think -- again, I just had

2    a chance to read it right before I came in.

3      My understanding, I think the issue may be whether she

4    crossed state lines because the law enforcement that reported

5    this accident was from Indiana.  I think she was taken to

6    Indiana for care.  And her position is that she didn't cross

7    state lines, that they came over.  And, obviously, if she had

8    done that, she would have left the judicial district.  I think

9    that's --

10      MS. PETERSEN:  Yeah, and we've had -- I know we've had

11    some violation reports of her going to Indiana before this

12    violation report.

13      THE COURT:  Okay.  Your position, Mr. Stanton?

14      MR. STANTON:  Judge, there is no dispute that she did

15    cross state lines.  There were extenuating circumstances.  This

16    was on February 13.  Her daughter had been traveling to South

17    Bend alone, and her car broke down in Chesterton, Indiana.

18    That was the weekend that we got over a foot of snow.  So she

19    was stranded on the side of I-94.  Ms. Kowalski and her mother

20    went to pick up her daughter on the side of the road there.  On

21    their way back, they got in a five-car crash.  And Ms. Kowalski

22    suffered a cracked rib as well as her daughter suffered

23    multiple pelvic fractures.

24      THE COURT:  Oh, I'm sorry to hear that.

25      MR. STANTON:  And Ms. Kowalski did alert her pretrial

1     officer a day -- I think two days later that she had contact

2     with Indiana State Police and that she had been in this

3     accident that occurred right at the bridge where the state line

4     is, I believe.

5           THE COURT:  Why not just call in to Pretrial Services

6     and say my daughter is stranded in Chesterton?

7           MR. STANTON:  I think that probably would have been

8     the, in retrospect, the best decision to make.

9           THE COURT:  Mr. Netols?

10          MR. NETOLS:  Yeah, I mean, I agree, your Honor.  And

11    also I think the real concern is the -- certainly the

12    circumstances were extenuating.  But the problem is that in her

13    interaction with Pretrial Services, none of these, like,

14    reasonable, understandable, you know, circumstances were told

15    to Pretrial Services.  She simply denied crossing state lines.

16    And so, I mean, it's a problem.  And, you know, her reaction,

17    when confronted with court supervision personnel, is not to be

18    truthful.  I think that's probably the bigger issue.

19          THE COURT:  Right.  I also -- why did she have a

20    different name?

21          MR. STANTON:  Judge, she was -- her mother has been to

22    court before.  She was traveling with her mother, who is

23    Rosemary Kowalski, who was also involved in the accident, of

24    course.

25          MS. KOWALSKI:  I'm Jan Rose --

1          MR. STANTON:  And she's Jan Rose Kowalski.  They put

2   her down as Marie Kowalski at the clinic, but -- I don't think

3   she willfully provided a false name to any treating physician.

4          THE COURT:  I don't know.  I can tell you is that we

5   just keep having these little minor, what would be minor

6   violations that keep piling in.

7          Under the circumstances, with the snowstorm and an

8   accident, et cetera, I'm going to admonish you on this one,

9   that you absolutely have an obligation to notify the Pretrial

10  Services Officer, even in an emergency situation, and maybe I

11  should say most importantly in an emergency situation, so that

12  the Pretrial Services Officer knows what's going on.  I mean,

13  it's critical for that.  And we've had this Indiana issue more

14  than once.

15         And I don't understand the Marie Kowalski issue there.

16  That makes no sense to me.  But I'm just going to admonish you

17  one last time.  And just remember that each time these little

18  ones pop up, if they continue on, you know what the next action

19  will be.  The government will be seeking to detain based upon

20  violations of the court order.

21         All right.  So I'm not going to do a revocation on

22  this today.

23         I hope your daughter is healing.

24         And you can be done today.

25         MR. STANTON:  Thank you, Judge.

1          THE COURT:  All right.  Move on.

2          MS. KOWALSKI:  Thank you, your Honor.

3          THE COURT:  Okay.  Mr. Kowalski is next.

4          MR. NETOLS:  Your Honor, for housekeeping, there is

5     one new count in the indictment as to this defendant, if you

6     would like me to apprise --

7          THE COURT:  You know what?  I'm having a little

8     trouble hearing you.

9          MR. NETOLS:  Sorry.  There is -- for housekeeping,

10    there is one new count in this indictment as to this defendant.

11    If you would like, I can apprise him of the statutory

12    penalties.

13         THE COURT:  Oh, no, he asked for -- he did not waive

14    formal reading of his indictment.

15         DEFENDANT ROBERT KOWALSKI:  Your Honor, may I beg the

16    Court's indulgence?

17         I've had a chance to consult with standby counsel.

18    And some of my concerns dovetailed your earlier comments about

19    discovery and that if I needed some special help with discovery

20    and as -- indeed, I did.  Me and Mr. Chiphe have a plan, and

21    part of my plan is some of the items that jump out at me, like,

22    for instance --

23         THE COURT:  No, we're not going to go this way.

24         DEFENDANT ROBERT KOWALSKI:  I --

25         THE COURT:  No, no.  This is not the way we do

1    business.

2         We're here for an arraignment on a superseding

3    indictment first.  We do that, and then we'll address any of

4    your concerns.

5         Are you still waiving formal reading of the

6    indictment?

7         DEFENDANT ROBERT KOWALSKI:  Yes, your Honor.

8         THE COURT:  I --

9         DEFENDANT ROBERT KOWALSKI:  I would like -- pardon --

10   I would like to waive reading of the indictment.

11        THE COURT:  Oh, you want to waive the reading of the

12   indictment now?

13        DEFENDANT ROBERT KOWALSKI:  Thank you, Judge.  Yes.

14        THE COURT:  Okay.  I will waive formal reading.

15        How do you plead to the superseding indictment?

16        DEFENDANT ROBERT KOWALSKI:  I am not guilty.

17        THE COURT:  Okay.  Would you please tell him what his

18   maximum penalties under the law are?

19        MR. NETOLS:  Yes, your Honor.

20        He's charged first with, in Count One, with violating

21   18 U.S.C. 371, which has a five-year maximum penalty, a

22   $250,000 penalty, and a -- or twice the gross gain.

23        He's charged in a new count, I believe it's Count Six,

24   with violating 18 U.S.C. 656, which is bank embezzlement.  That

25   has a 30-year maximum sentence, $1 million fine, or twice the

1   gross gain.

2           He's also charged in a series of 152 and 157(1),

3   157(2), and 157(3) violations.  The 152 violations are 152(1)

4   and 152(8).  All those have the same penalty, which is a

5   five-year maximum, $250,000 fine, and twice the gross gain or

6   loss.

7           In addition, he's charged with multiple failure to

8   files and filing false returns.

9           The false returns are a maximum of three years and

10  $250,000, cost of prosecution.

11          The false returns are one year, $100,000, and cost of

12  prosecution.

13          THE COURT:  Okay.  Mr. Kowalski -- and there's also --

14          MR. NETOLS:  There are forfeitures, yes, your Honor.

15          THE COURT:  Mr. Kowalski, do you understand that, if

16  you are convicted of all counts of the superseding indictment,

17  those are the maximum time and penalty that you can receive?

18          DEFENDANT ROBERT KOWALSKI:  Thank you, Judge.

19          THE COURT:  Do you understand that?

20          DEFENDANT ROBERT KOWALSKI:  I do.

21          THE COURT:  Okay.  All right then.  Let's now move

22  into a number of other issues.

23          I know that you filed a couple motions, and now you

24  can go -- let's start with those two motions, okay?

25          DEFENDANT ROBERT KOWALSKI:  I'm sorry, Judge, which

two motions?

THE COURT:  I thought that I had two motions.  Don't I, Lynn?

THE CLERK:  There was one for modification of bond conditions.

THE COURT:  Yes, right.  I'm looking for it.  I've got too much paperwork.  Hold on.

There you go.  Thank you.

Did you not receive a copy of this?

MS. PETERSEN:  We did.

MR. NETOLS:  We did see it online, your Honor, yes.

It appears to be the same -- essentially the same motion that he presented a couple weeks ago and you denied.  I don't see any change in circumstances.

THE COURT:  Okay.  One is to modify bond conditions, and the other is to obtain the services of a computer or printer.  Okay?

So, Mr. Kowalski, you may argue your motion to modify your bond conditions now.

DEFENDANT ROBERT KOWALSKI:  Your Honor, I have a two-year-old son.  I'd like to live with my family.  There's absolutely no reason why I shouldn't.  There is no orders of protection.  Had Ms. Lira been able to testify, she would have told you that directly.  And I'd like to -- I'd like to be a father.  I miss my family.  And living with my sister is an

1    imposition upon her.  It's an imposition upon my family.  And

2    me and Ms. Lira are a couple.  We're parents.  And I would like

3    to parent.

4            THE COURT:  Okay.  There has been no change in

5    circumstances.  And, as always, she has the ability to visit

6    you, and your son has the ability to visit you.

7            So the motion to modify bond conditions is denied.

8            The application for the services of a computer and

9    printer.  I talked with the Clerk of the Court, and I don't

10   know of any ability for the Court to provide you with the

11   services of a computer or printer.

12           Mr. Chiphe, is there anything that you are aware of

13   with the Federal Defender Program that would enable him to be

14   able to use a computer or printer?

15           MR. CHIPHE:  Not -- not at his home, your Honor.  Of

16   course, you know, I've been filing his motions for him.  And I

17   guess, you know, to the extent he needs some documents or

18   discovery printed out, we can do that.  You know, I don't know

19   if we will be able to print out all the discovery.  I need to

20   sit down, and I guess I will, sit down with Mr. Kowalski to see

21   how much he's able to do online with the computer setup he has

22   there at his home.  Ordinarily, that's how I have the discovery

23   is online.  I'm not -- you know, if I was trying this case, I

24   wouldn't print out all the documents.

25           THE COURT:  Of course not, right.

1          MR. CHIPHE:  So I can assist him with, you know,

2     printing out certain things.  Of course, I understand being

3     able to -- you know, you want to print out some -- have hard

4     copies of some documents that you think are important, and so I

5     can assist him with some of that stuff.

6          THE COURT:  Okay.  Well, I don't have any ability

7     to -- there's nothing that I am aware of in the Court's funds

8     that says I can buy computer equipment for a *pro se*

9     plaintiff -- or defendant, rather.  I'm sorry.

10          DEFENDANT ROBERT KOWALSKI:  Your Honor, I need the

11     discovery.  If I can't view and access the discovery --

12          THE COURT:  Well, you're getting the discovery, and

13     you have a computer, so -- I just don't see how I -- I'm not

14     like somebody who can upgrade your system because you chose to

15     go *pro se.*

16          DEFENDANT ROBERT KOWALSKI:  Your Honor, I'm not asking

17     for that.  I'm asking for the services to be able to access my

18     discovery.  I think the government could provide a hard copy of

19     this information.  I don't think it would be a problem.  I need

20     to access this information, as any other defendant would be

21     able to and --

22          THE COURT:  Okay, so --

23          DEFENDANT ROBERT KOWALSKI:  -- preventing me from

24     doing so.

25          THE COURT:  No, I'm not preventing you from doing so.

1   You have standby counsel that you can work with.

2         Mr. Netols -- oh, by the way, the rules do not require

3   the government to print hard copies for you.  That has never

4   been the rule or the law.

5         Mr. Netols, what's your position on hard copies?

6         MR. NETOLS:  Judge, we haven't done that in years.

7   It's not required.  It's, frankly, extremely expensive if we

8   were to do that.  And just the whole logistics of doing it is

9   something we stopped doing 20 years ago.

10        MS. PETERSEN:  Your Honor --

11        THE COURT:  How many years ago?

12        MR. NETOLS:  It's probably been 20 years.

13        MS. PETERSEN:  Our discovery is very voluminous, and

14  it includes things like Excel spreadsheets that would be

15  difficult to print out and access.  And we're also giving

16  native files so that, you know, he can see the metadata and

17  whatnot, so it wouldn't make sense to print it out.  It

18  wouldn't be nearly as usable for him.  And it's millions and

19  millions of pages of paper.

20        THE COURT:  Right, which he needs to prepare and

21  review for his defense.

22        So what is your proposal?

23        MR. NETOLS:  I mean, I guess, your Honor, if he wants

24  to -- I mean, I understand he has a computer.  I'm not -- I

25  don't know --

1          DEFENDANT ROBERT KOWALSKI:  That's not the correct

2     understanding.  I do not.

3          THE COURT:  Mr. Kowalski, we do not do it that way in

4     my courtroom.  I always give you an opportunity to speak.

5          DEFENDANT ROBERT KOWALSKI:  Thank you, Judge.

6          THE COURT:  Don't interrupt.

7          MR. NETOLS:  I believe Mr. Chiphe just said he had a

8     computer.

9          We can tell from some of his responses and his motions

10    that he's seen the records.

11         Perhaps one of the options would be if he goes -- if

12    he can identify certain things that he might want to print, we

13    can print those for him.  But to print all of them would be --

14    I can't even begin to -- because what happens is we know what

15    is going to be evidence in the case pretty much for sure, but

16    there's also the context.  And I don't know what his defense

17    might be.  And so I don't know in all -- we've basically given

18    him access to essentially all the records of the bank that are

19    loaded up.  Those are, as you might guess, very voluminous.

20    I -- and we -- many of those records, frankly, we don't see how

21    they might be useful, but I'm not going to try and guess what

22    his defense is going to be.  So we've given the opportunity,

23    consistent with the protective order, to go through all those

24    loan files; and if he says some kind of argument he wants to

25    make, maybe he wants to ask us for particular loan files -- so

1    I guess my concern would be, you know, we've given him, you

2    know, what we see is -- would be clearly evidence in our

3    case-in-chief.  I don't think we see anything that's

4    exculpatory.  And we've given him everything else so that it's

5    in context.  And so he -- he needs -- if he's got particular

6    things that he wants, we would suggest that he request those

7    and we can find a way to meet in middle ground on them.

8          THE COURT:  So are you offering to give hard copies of

9    the evidence that you will be presenting?

10    (Counsel conferring.)

11         MS. PETERSEN:  We can -- there's certainly easily

12    identifiable buckets, right?  The grand jury exhibits or

13    certain things that would be relatively easy to print out and

14    give him a hard copy.  I mean, we have not identified every

15    single trial exhibit, so I don't think we could give him, you

16    know, this is the universe that would come in at trial, but --

17         MR. NETOLS:  We could give him grand jury transcripts

18    printed out, grand jury exhibits printed out, reports.  That's,

19    you know, the definable, you know, universe.  The rest of it is

20    essentially we've given him access to search through the bank's

21    files, and that's something we just -- we've never printed out

22    for ourselves.  I don't know how we would even do it.

23         THE COURT:  How voluminous is the 3500 material?

24         MS. PETERSEN:  The 3500 material alone is going to be

25    certainly thousands of pages.  I mean, there's hundreds of

1    interview reports, plus their exhibits.  I don't -- I can't put

2    a page number on it, but it's going to be very voluminous.

3          THE COURT:  Let's start there.  Okay?  A kind request

4    that is not required by the law will be that the government, if

5    you can, provide Mr. Kowalski with hard copy printouts of the

6    3500 material.  Okay?  We'll start there.

7          Other exhibits, Mr. Chiphe will sit down, and if he

8    has other issues.  And that does not have to be on an immediate

9    basis.  This can be a rolling basis.  I know that there's not

10   people in the office regularly, so however that's going to

11   happen.

12         MR. NETOLS:  Right.

13         MS. PETERSEN:  And to date, we have not produced a lot

14   of the 3500 material, you know, in part --

15         THE COURT:  Oh, that's --

16         MS. PETERSEN:  -- just because we're still far away

17   from the trial date and because it's an ongoing investigation,

18   but --

19         THE COURT:  Well, to the extent that you have the 3500

20   material in some format, that would definitely be a good

21   start --

22         MS. PETERSEN:  Yes.

23         THE COURT:  -- for us.

24         Okay.  And then, Mr. Chiphe, you can help him with

25   something else if he desires, okay?  Certain -- or you can --

1    maybe we can work on that.

2              MR. CHIPHE:  (Nods affirmatively.)

3              THE COURT:  All right.  Anything else that we need to

4    address with Mr. Kowalski today?

5         (Counsel conferring.)

6              MR. NETOLS:  Not by the government, your Honor.

7              THE COURT:  Okay.  All right.  Mr. Kowalski, anything

8    else that you want to address, sir?

9              DEFENDANT ROBERT KOWALSKI:  Just to -- I'm very

10   concerned about the vagueness of this indictment and the need

11   for discovery.  When certain things are announced, for

12   instance, in paragraph 47-O, that certain loans -- 13 loans

13   were added on to, things of that nature, I really need to know

14   exactly what loans they are.  So I'm very happy to see the

15   ghosts have been exorcized from this indictment.  But the

16   inherent vagueness, it's really difficult to defend yourself

17   against something that -- I don't know what 13 loans that

18   Ms. Mandujano may have done something to, whatever they're

19   alleging --

20             THE COURT:  Okay.  And as an attorney, what do you do

21   when you believe that the indictment is vague and doesn't give

22   you all of the information that you need?

23             DEFENDANT ROBERT KOWALSKI:  Yes, Judge.  I know I

24   could file a motion.  I -- in light of your earlier comment

25   about cooperation and getting the right discovery, I want the

1    government to be -- to be cooperative with them as well.  I

2    don't want to be obtuse, but yet I do need the specific

3    information that they're bringing to the Court's attention,

4    that that also brings my attention.  And I would like to

5    cooperate with them.  And Mr. Chiphe has offered to be an

6    intermediary.

7              THE COURT:  Certainly.  If you wanted that information

8    and you ask Mr. Chiphe, he can contact -- you can contact --

9    you represent yourself.  You can contact Mr. Netols or

10   Ms. Petersen and say what are the loans --

11             DEFENDANT ROBERT KOWALSKI:  But your Honor --

12             THE COURT:  -- or Mr. Chiphe can.

13             DEFENDANT ROBERT KOWALSKI:  But there's an inherent

14   reluctance on the part of the government.  I understand their

15   reluctance to discuss things directly with me because that

16   might raise a Fifth Amendment issue about self-incrimination,

17   and I respect that.  And I want to cooperate.

18             If Mr. Chiphe could help me with that, I would

19   appreciate it.

20             THE COURT:  I didn't hear of this latest wrinkle with

21   communication with the government; but certainly if you would

22   be willing to work through Mr. Chiphe, he can contact

23   Mr. Netols or Ms. Petersen and go forward.  Okay?

24             MR. NETOLS:  And he has the records that would

25   identify those loans.  And, for example, we could point those

1    out to him or --

2              THE COURT:  Right.

3              MR. NETOLS:  He's got those.

4              THE COURT:  Okay.

5              MR. NETOLS:  It's in the grand jury exhibits, which he

6    has.

7              THE COURT:  Great.  And you can maybe tell him which

8    loans they are and move from there, okay?

9              Anything else from you today, Mr. Kowalski?

10             DEFENDANT ROBERT KOWALSKI:  No.  Thank you very much,

11   your Honor.

12             THE COURT:  Great.  Okay.  Everyone please stay well,

13   take care of yourselves, and I'll see you in April.

14             MS. PETERSEN:  We do have Mr. Krejza's -- sorry, no,

15   Mr. Matczuk's bond.

16             THE COURT:  Okay.  Please pass that forward to Lynn.

17             I don't think he needs to be here any further because

18   I already, you know, advised him of the conditions, and we'll

19   see him next week.

20             MR. HYMAN:  Yes.  We talked to his wife, your Honor,

21   and she will be here at 10:00 o'clock on --

22             THE COURT:  Okay, wonderful.

23        (Counsel conferring.)

24        (Documents tendered to the Court.)

25             THE COURT:  Thank you.

1          Anything else, Mr. Netols?

2          MR. NETOLS:  No, your Honor.  Have a good day.

3          THE COURT:  Mr. Pissetzky?

4          MR. PISSETZKY:  Thank you.

5          I just spoke to the marshals.  So they said as soon as

6     they have the paperwork, they can probably process --

7          THE COURT:  Great.  Okay.  The paperwork is in Lynn's

8     hands, in Lynn's able hands.

9          MR. PISSETZKY:  Absolutely.

10         THE COURT:  Okay.  Thank you.

11         MR. PISSETZKY:  Thank you.  Have a great day,

12    everybody.

13         THE COURT:  You can end it.

14         THE CLERK:  All rise.  Court is in recess until 2:30.

15      (Concluded at 1:35 p.m.)

16                 C E R T I F I C A T E

17      I certify that the foregoing is a correct transcript of the

18    record of proceedings in the above-entitled matter.

19

20    _/s/ GAYLE A. McGUIGAN_____      _May 12, 2021_
      GAYLE A. McGUIGAN, CSR, RMR, CRR
21    Official Court Reporter

22

23

24

25